# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**DENNIS GROMOV,** individually and
on behalf of all others similarly situated,

      Plaintiff,

          *v.*

**BELKIN INTERNATIONAL, INC.,**

      Defendant.

Case No. 1:22-cv-6918

Judge Valderrama

Magistrate Judge Fuentes

## MOTION TO COMPEL BELKIN'S ANSWERS
## TO GROMOV'S DISCOVERY REQUESTS

This motion to compel seeks an order requiring Belkin to make fair discovery. It has been over three months since Belkin was served with discovery requests. Belkin's total response has been 38 pages and scores of objections, but no real response at all. Nothing has really happened in this action since the June 29 status report, but the Court did note that a motion to compel should be filed if Gromov wants help. This is that motion.

Alarmingly, Belkin claimed to have done a "reasonable search" for documents and repeatedly stated that no such documents existed—but Belkin has produced highly responsive documents in a different power bank case, *Miley v. Belkin*, in California state court, that should have been produced again here. Belkin has been in California litigation—and ought to still be observing a litigation hold there—on its mislabeled power banks for four years, and it knows full well what documents exist.

1

Belkin also has hidden behind its purported need for a protective order, but has not answered Gromov's July 6 and 7 questions about how such an order might work, and it hasn't put one before the Court.

Belkin has just been absent from the field here. As to requests *it* has made, Belkin unilaterally set Gromov's deposition on June 9 without conferring with Gromov or his counsel on dates. Belkin then withdrew the notice and never provided any alternate dates for the deposition. Gromov is in no hurry to be deposed, but it shows Belkin is not doing much. Similarly, Belkin demanded to inspect Gromov's power bank and cell phone. Gromov asked Belkin for an inspection protocol as to the power bank, and refused to produce the phone without further explanation as to relevant. Gromov has been waiting since June 12 for both those answers.

Belkin's conduct is obstructive. Gromov cannot take depositions of Belkin employees until Belkin provides answers to his requests. Gromov asks the Court for help in getting discovery going further.

## I.    Procedural history.

Here is the relevant timeline.

- April 21: Gromov served requests for production, interrogatories, and requests for admissions on Belkin. **(Ex. A.)**

- June 5: Belkin responded—timely, pursuant to an agreed extension between the parties. Belkin produced *no* documents on this date. **(Ex. B, C, D, Belkin's responses to RFPs, interrogatories, and RFAs.)**

- June 9: Gromov and Belkin conferred on Belkin's responses and objections. Belkin's lawyers stated that they needed to discuss some matters with their client, Belkin, and would do so. It has been almost two months, and Belkin has ***never*** communicated any response to any issues raised at the meet-and-confer session.

- July 5: Belkin untimely produced just 38 pages of documents. The documents produced are, in total:

- o Copies of exterior packaging of batteries.

- o A marketing photo of a battery.

- o A letter from plaintiff's counsel in the California state court case, *Miley v. Belkin*.

- o A copy of test results conducted by a defense expert in connection with *Miley v. Belkin*.

## II.  Argument.

**Issue 1:**     **Belkin did not produce documents from many categories where Gromov knows such documents actually exist.**

**Requests affected:**          **Unknown, but at least RFP 7, 10, 12, and 16**

Belkin is a party to the *Miley* action in California state court. In *Miley*, Belkin produced over 1,000 pages of documents. Many of these documents are directly relevant to requests made here in *Gromov*. Yet, in its responses, Belkin denies being able to find the same documents. We know that Belkin's responses in *Gromov* are incomplete; we do not know why.

This begs the question: What else is Belkin holding back, or where else has Belkin's counsel failed to look?

For example, Gromov's RFP 7 sought the following: "Any document, including a communication, where Belkin considered changing its charging statements, or the basis for those statements, even if the change was not actually made." Belkin's answer was a few objections and then: "Belkin was unable to locate any non-privileged responsive documents in its possession, custody, or control following a reasonable search." RFP 10, similarly, sought documents evidencing "consumers' understanding or confusion about stated capacity or charging statements, with respect to any Belkin power bank." And Belkin similarly denied that any such documents could be located.

But that's not so. Belkin began receiving consumer complaints about its mislabeled power banks in 2017—if not earlier. At the time, Belkin used to print a "10000" stated capacity on the product's packaging, with a true "6070" output energy disclosed only in small print on the product after you bought it and took it home. Ex. #X7# is one such complaint; it is a transcript of a December 5, 2017 web chat with a consumer, who complained that a Pocket Power 10000 model did not give a 10000 mAh capacity:

Comments **This is the first time**09:16:23
**Asvini M**
**How may I help you today?**09:16:52
**JJ Tang**
**I dont have a case number.**09:16:55
**I purchased the pocket power 10K charger**09:17:06
**so i took it out from the box.. and when i looked at the back of the power bank...**09:17:38
**it indicates that it has a capacity of 6070mAh**09:17:48
**why is this the case? can u check? i believe the product is supposed to have a 10000 mAh**

(**Ex. E** at BELKIN-279.) This document is plainly responsive to RFP 10, which, again, sought "all documents . . . concerning consumers' understanding or confusion about stated capacity" of any power bank, and there are dozens more like this.

(By the way: although Belkin stamped its documents in *Miley* as "confidential," there is no protective order in place, and therefore no bar on using them in this Court.)

Belkin also had complaints from Rogers Wireless, the largest cell phone company in Canada, and B&H Photo, which is a large retailer in New York. According to Rogers, Belkin's products were so misleadingly labeled that: "As of today they have quarantined all our product from the stores for F7U019, F7U020"—the 5000 and 10000 mAh models—"due to the confusion created by rated capacity and maximum capacity." (**Ex. F** at BELKIN-1076 (underline in original).) Belkin asked itself: "How will this be addressed moving forward – will there be a permanent

change to batteries . . . [?]" *Id.* According to B&H Photo, "the packaging is WRONG." (**Ex. G** at BELKIN-1100.)

Belkin discussed the issue again in an e-mail comparing the "Project Worm" models—the Pocket Power 5000, 10000, 15000 models—and the fact that the capacity on the package is nowhere close to the actual output performance:

As talked to you before that we have some issue with the marking on battery pack (F7U019/F7U020/F7U021).
We are selling 5k/10k/15k but the marking on product is 2900/6070/7700mAh.

Here's the efficiency calculated according to the information on product:

| Part | Cell Capacity (mAh) | Printed Capacity (mAh) | Efficiency % |
|------|---------------------|------------------------|--------------|
| F7U019 | 5,000 | 2,900 | 58% |
| F7U020 | 10,000 | 6,070 | 60.7% |
| F7U021 | 15,000 | 7,700 | 51.33% |

(**Ex. H** at BELKIN-779.) (This document also underscores the fact that the Pocket Power models are substantially similar—labeled the same, underperforming the same.)

All of these documents would have been directly responsive to RFP 10, and again, Belkin certified, with a lawyer's signature, that after "a reasonable search," there were no documents to produce. Not true.

These documents were also responsive to RFP 16, which flatly asked for "all complaints (formal and informal)" Belkin received about power banks. Belkin made no production for that category either.

In response to dozens of complaints like these, Belkin executives swung into action. They created an "Executive Summary" describing the problems and what to do about it. (**Ex. I**.)

### Executive Summary
MPP

| Financial Summary (YTD 04/2018) | | | | | | |
|---|---|---|---|---|---|---|
| | FOB | SRP | GIM % | GP % | Gross Sales | Net Sales |
| Budget | n/a | n/a | n/a | 22.5% | $9.2M | $7.5M |
| Actual | n/a | n/a | n/a | 21.5% | $9.1M | $7.6M |

**Decision Deadline**
05/08/2018

**Ex-Factory Date**
n/a

**Go-Live Date**
5/22/2018

**Issue Escalation or Request**

Removing UL/ETL certifications from MPP product line.

**Business Summary**

For MPP category, we have been using optional UL/ETL certifications for a competitive advantage. However, it requires us to print text that shows our capacity as lower than our competitor.

**GPM Case or Recommendation**
- Remove UL/ETL certification
  - Optional cert originally used for competitive advantage (safety cert)
  - With new standards, hurts us to put power bank capacity rather than cell capacity (see "other notes" for definition)
- Currently, numerous customers are questioning our product
  - Canadian Telco (Roger) has quarantined Pocket Powers

**Risk Exposure**
- Loss of customers across the globe
- Increase rate of return

As the Court can see, Belkin acknowledged that "numerous customers are questioning our product" and there was a risk of "Loss of customers across the globe." *Id*. And it "hurts us to put power bank capacity rather than cell capacity" (!!!). *Id*.

So—Belkin's decision was to remove the Underwriters Laboratories (UL) certification from the Pocket Power models, which would allow them to stop "print[ing] text that shows our capacity as lower than our competitior." *Id*. In other words, Belkin made the decision to take the *truthful*, accurate output capacity numbers off its products—along with the famous UL logo—just to stop the consumer complaints. *See also* **Ex. J** ("we've been creating a confusion . . . and receiving multiple inquiries on this from different customers across the globe"). There are many more documents that tell this story, none of which was produced here.

And **Ex. H** and many others like it are documents which Belkin was required to produce in response to Gromov's RFP 7: "Any document, including a communication, where Belkin

considered changing its charging statements, or the basis for those statements . . . ." But again, Belkin's answer, certified by one of its lawyers was: there are no responsive documents.

This issue—Belkin denying the existence of a document in *Gromov* that it produced in *Miley*—is pervasive. To take yet another example, RFP 12 called for "consumer market research." This is another RFP where Belkin said it was "unable to locate any non-privileged responsive documents in its possession, custody, or control following a reasonable search." But there *are* market research studies on power banks. In one of them, Belkin found that "technical specifications" was *the* top factor consumers use in selecting a power bank. (**Ex. K**, marketing study, at BELKIN-166; **Ex. L**, Von Boode Dep. 82:21–84:9.) This document should have been produced too—along with any other responsive documents.

Comparing what is available from the California *Miley* action against what Belkin has "agreed" (its word) to produce in this Northern District *Gromov* action, it is clear that Belkin did not make a fair document production. It begs the question, what else is missing?

This is all the more concerning because **Ex. A,** Gromov's request for admissions no. 1 **and its sub-exhibit A**—with the entire *Miley* document production attached—*directly put Belkin's counsel on notice* of the existence of the documents here in *Gromov*. Belkin uses separate legal teams in these cases, but neither Belkin nor Belkin's *Gromov* lawyers can claim to be unaware of the existence of these documents. They had them for seven weeks before they served these responses.

Every discovery request must be signed by an attorney of record. Rule 26(g)(1). "By signing, an attorney or party certifies that to the best of the person's knowledge, information, and belief formed after a reasonable inquiry," it is consistent with the Rules. Rule 26(g)(3) mandates an

appropriate sanction on the signer, the party, or both if the response is not consistent with the Rules.

It is not a cure for Belkin to state that Gromov's counsel got these documents in *Miley*, therefore Belkin need not produce them again in *Gromov*. These are different cases and different parties. In *Gromov*, Belkin was required to produce for inspection and copying *all* responsive documents. Our concern is not that we didn't get a duplicate of *Miley*'s production; our concern is that, plainly, here in the Northern District of Illinois, Belkin has engaged in no serious search of its own files, even after arrogating an extra couple of months for itself outside the Rules. And what else has not been produced?

Relatedly, Belkin's attorneys have taken the position that the scope of discovery in California state courts is different than that in the federal courts. That is true. And the different law might mean Belkin needs to look at the same matters through two lenses. Here in *Gromov*, Belkin has done little of anything.

The Court should order Belkin to promptly revisit all of its discovery responses and make them complete. Belkin's cavalier attitude toward its obligations displays a lack of respect for Gromov and the Court. The Court should consider imposing an appropriate sanction under Rule 26, which might include the cost of preparing this motion.

**Issue 2:** **Belkin has failed to make production of documents that it "agreed" to produce, and is now two months overdue in doing so.**

**Requests at issue:** **RFPs 2, 3, 5, 13, 14, 16, 18, 20, 24**

As recounted above, Belkin's discovery responses were due June 5 by agreed extension and that included Belkin's documents. Belkin disagrees, citing language in Rule 34 that Belkin claims allows a responding party to choose *any* "reasonable" date on the calendar to produce

documents, so long as that date is timely stated. (ECF No. 34, Belkin status report at 2–3.) Belkin claims that this means it is permitted to delay production for 30 days plus more "on a rolling basis" and after a protective order is entered by the Court. That could be months from now—or never.

Belkin has not even *moved* for a protective order. Nor has Belkin responded to Gromov's multiple inquiries about the operation of such an order. (**Ex. M**, July 7 e-mail in which Belkin says "we will get back to you as soon as we can." This is four weeks ago; Belkin's last word.)

To reiterate, Belkin's documents were due June 5, and if the need for a protective order is a reason to stall production, Belkin has not responded to Gromov's requests about that protective order for four weeks.

Belkin has failed to make any production of documents in multiple categories where it has "agreed" to do so. Specifically:

- RFP 2: "Belkin agrees to produce organizational charts responsive to this Request, which can be located through a reasonable search."

- RFP 3: "Belkin agrees to produce documents that can be located through a reasonable search sufficient to establish the name, model number, SKU number, and other product information relating to the Pocket Power 10K that Plaintiff alleges in the Complaint that he purchased."

- RFP 5, 13, and 14: "Belkin agrees to produce non-privileged documents responsive to this Request in its possession, custody, or control and located through a reasonable search, which relate to the Pocket Power 10K that Plaintiff alleges he purchased."

- RFP 16 and 18: "Aside from any documents related to Lenore Miley and/or produced in the lawsuit brought by her, which are already in the possession of Plaintiff's counsel, Belkin agrees to produce any non-privileged documents responsive to this Request that are in its possession, custody, or control and located pursuant to a reasonable search, which relate to the Pocket Power 10K that Plaintiff alleges he purchased."

- RFP 24: "To the extent they exist, Belkin agrees to produce non-privileged responsive documents in its possession, custody, or control that can be located pursuant to a reasonable search."

And RFP 20. The objection stated in RFP 20 is the same as the one in RFP 5, except that Belkin has added "following the entry of a suitable protective order." Belkin's objection there should be overruled because Belkin has had over three months since being served with RFP 20 to seek such an order and has not done so.

These categories of documents are ones where Belkin doesn't even object to production. Belkin should be ordered to complete this production right now.

> **Issue 3:** **Belkin asserts objections as to standing to conduct discovery on any product other than Belkin's Pocket Power 10000, but Belkin makes a whole line of substantially similar products.**

**Requests at issue:** **RFPs 1–23, interrogatories 1–7, 9–14, 16–17**

Gromov purchased the Belkin model called "Pocket Power 10000." The Complaint alleges a class of consumers who purchased any similar Belkin power bank.

Belkin argues that Gromov can only represent a class of Pocket Power 10000 buyers and therefore limits its responses solely to that model. Typically the objection is stated in language like this: "Plaintiff alleges that he purchased one Belkin battery pack, the Pocket Power 10000. He therefore lacks standing to assert claims based on any other Belkin battery pack (of which there are over two dozen), and discovery as to these other unpurchased products would be improper." (Belkin's response to RFP 1.) It appears in almost every response.

Belkin is incorrect. Gromov does have standing to assert claims as to substantially similar Belkin power banks. *Geske v. PNY Techs, Inc.*, No. , 1:19-cv-5170, 503 F. Supp. 3d 687, 699–701 (N.D. Ill. 2020). *Geske* is a power bank case with very similar allegations to Gromov's, and in that action, Judge Seeger held that "Geske has standing to sue on behalf of a class of consumers who purchased PNY power banks that involve the same type of alleged misrepresentations." *Id.* at

700. Because the power banks at issue all operate in the same manner, have a similar design, and consumers allegedly "suffer the same injury," PNY's power banks were substantially similar enough that Geske could represent a class composed of the purchasers of all PNY power banks. *Id.* The Court should adopt this same analysis with respect to Belkin.

Moreover, there is ample evidence that Belkin power banks are designed in the same way and marketed in the same way. Consider Belkin's engineering concept for "Project WORM." (**Ex. N** at BELKIN-238.) Project WORM was Belkin's code name in 2017 for three proposed models that ultimately became the Pocket Power 5000, 10000 (Gromov's version), and 15000. (**Ex. L**, Von Boode Dep. 16:7–22 (Von Boode is leader of global product management team for mobile power), 68:6–13 (identifying BELKIN-238), 69:3–7 ("Worm 2 was the project name for Pocket Power 10K, yeah.").)

The Project WORM document identifies the three batteries as having essentially identical functionality, other than the capacity and number of ports:

**Key Product Features:**

| | WORM 1 | WORM 2 | WORM 3 |
|---|---|---|---|
| Capacity | 5000mAh | 10,000mAh | 15,000mAh |
| Battery Type | Polymer | | |
| Output Port | 1 USB-A | 2 USB-A | 2 USB-A |
| Output Amps | 2.4A | 2.4A (shared) | 3.4A (shared) |
| Input Port | Micro-USB | | |
| Input Amps | 2.4A* (See Section 2.03) | | |
| Cable | 6" micro-USB male to USB-A male | | |
| LED | 4-LED indicator | | |
| Housing | Plastic - PC | | |

**Product Life**: 2-3 years

**Warranty:** 2 year limited warranty. CEW.

**Estimated Annual Forecast: 650k total** (includes all three models)

Similarly, in internal e-mails noting that consumers were complaining that battery packs listed a high capacity on the exterior packaging (5000, 10000, or 15000 mAh), but then saw lower

true output capacity numbers printed on the devices themselves, Belkin made no distinction or argument that the Pocket Power 10000 is any different from any other model. (**Ex. O** at BELKIN-546 ("the 15000 mAh power pack lists 7700 mAh on the fine print of the product"), BELKIN-559 ("the 10K and 5K PP both say a different mAh on the physical product being 6070mAh and 2900mAh respectively").) Belkin's Australia/New Zealand product manager went on to write: "We could lose massive business if we can't rectify or clarify the situation ASAP." *Id.* at BELKIN-560. There's no distinction made among the Pocket Power models because they're designed the same way, built the same way, and critically, labeled in the same misleading way.

Moreover, Belkin's global product manager *confirmed* that Belkin labels all its power bank models in the same misleading way:

> **Q.** You put 10,000 mAh on the front of this particular product. With respect to the other products that Belkin makes beyond the 10K, can I assume, essentially, that it's apples to apples, that whenever you use a number on the front of the package, you are referring to the same system of adding up all the battery cells to get that equipment?
>
> In other words, you use the same common terminology with respect to the mAh number on the front; is that true?
>
> **A.** The number represents the cell capacity included in the hardware, yes.
>
> **Q. And that's true for all the Belkin power banks that you're aware of?**
>
> **A. That I'm aware of, yes.**

(**Ex. L**, Von Boode Dep. 33:22–34:12; *see also id.* at 16:7–16:22 (leader of global product management team for mobile power).)

Finally, Belkin said in *Miley*, as it does here, that labeling its power banks the way it does is an industry standard and that it hews to that standard. (**Ex. P** at Am. Special Interrog. No. 4

("the general industry practice of which Belkin is aware is . . ."; **Ex. C**, Belkin's response to *Gromov* interrogatory 4.). Gromov disputes there is an industry standard, but Belkin's answer is another admission that it labels its power banks all the same way—and that makes them substantially similar in terms of the injury consumers suffer—and that means that Gromov is entitled to discovery on all of them.

Finally, there are dozens of consumer complaints, like **Ex. E**, where consumers complain about misleading mAh values, and they do not come just from the model 10000 units. These complaints can be found at BELKIN-256–329 and BELKIN-693–768 in the *Miley* production. (Because these chats contain consumer names, e-mail addresses, and phone numbers, Gromov redacts these pages from this motion record, but will make them available to the Court if asked.)

The Court should overrule this objection of Belkin's in all of the discovery responses where it appears. And the Court should order Belkin to give discovery as to each of its power banks.

**Issue 4:     Belkin did not answer interrogatory number 2, relating to models that are not substantially similar.**

**Requests affected:          Interrogatory 2**

Gromov anticipated that Belkin might argue that certain power banks in its range are not substantially similar to the Pocket Power 10000. This contention interrogatory asks Belkin to explain why not. Belkin refused to answer it on the basis of standing (Gromov's issue 3).

The Court should find for Gromov on issue 3 and then direct Belkin to answer interrogatory 2 for the same reasons.

**Issue 5:    Belkin withheld necessary engineering documents on grounds of relevance. Requests at issue: RFP 4**

Gromov sought "design specifications and drawings, including parts lists, for each Belkin power bank." Belkin objected, stating that "Plaintiff's claims in this case relate to the representations on the labels/packaging and advertisement. It is unclear how the battery pack's design specifications, drawings, and parts list relate to these issues."

The need for such documents is obvious. This is an electronic product that mainly consists of big battery cells and a small circuit board that manages the charge and discharge of those cells into an external device like a phone. The job of the circuit board is to put out a steady amount of power in a safe way so that the device does not overheat or explode. Manufacturers, electronics experts, and some lawyers know—but consumers generally *don't* know—that this circuit board consumes energy on its own. In other words, the consumer can't ever get 10000 mAh "out" of a "Belkin 10000" power bank because the circuit board eats up some of the "juice" for itself. None of these facts is in dispute between the parties.

Belkin maintains throughout, *i.e.,* Interrogatory 4, that "the general industry practice is to identify the size of the power pack by the amount of energy that can be stored in its lithium battery polymer battery cells." Well, Gromov is certainly entitled to understand what those cells are, and what the other components inside the power bank might be, in order to compare the product label with the product's real world performance.

By the way: Belkin asserted nothing here about trade secrets. That was right, because the identity of components inside an electronic product like this is no secret. Indeed, "teardown" web sites like iFixit routinely do this work. (A different manufacturer's pack is torn down here: https://www.ifixit.com/Teardown/iMuto+20000mAh+Portable+Charger+Teardown/100341.)

Gromov is entitled to answers directly from Belkin, however, and Belkin should be ordered to answer RFP 4.

**Issue 6:    Belkin refused to produce any exemplar power banks.**

**Requests at issue:        RFP 1**

Not only did Belkin refuse to say what is in its power banks, Belkin has refused to produce a single exemplar of even *one* of them. Ironically, while Belkin refuses to produce any exemplar power banks here, Belkin has requested that *Gromov* produce *his* unit for inspection.

Gromov's RFP no. 1 sought "an exemplar of every power bank" identified in interrogatory no. 1, which in turn asked Belkin for the name of "all power banks put out by Belkin since January 1, 2018."

Summarizing Belkin's objections, Belkin argued that:

- the RFP was overbroad, unduly burdensome, not relevant to any claims or defenses, and not proportional to the needs of the case;

- Gromov has no standing to seek power banks other than the Pocket Power 10000 (Gromov's issue 3);

- an exemplar is already in Gromov's hands (his own unit) and therefore he does not need one from Belkin; and

- because Gromov did his own testing, there is no reason to test an exemplar of Belkin's.

Regarding the burdensomeness arguments, Belkin did nothing to substantiate them and they should be overruled. Moreover, Belkin makes and distributes these products. It is reasonable to expect that Belkin can make them available for testing.

It is hard to see how Belkin can *not* produce these units for inspection. If Belkin is successful in maintaining this objection, at trial Belkin will argue that the only unit Gromov has ever

inspected is his own, and will then say there is no evidence that his unit represents the class as a whole.

Belkin is not playing fair. One of the few documents Belkin *did* produce in *Gromov* was a test report from *Miley* in California, showing that, when it wants to, Belkin is perfectly capable of finding three identical exemplar units for testing by its own expert. (By the way: it also shows that the team representing Belkin here in *Gromov* does have access to the litigation file for *Miley*.) Here are exemplar units, alongside Ms. Miley's, attached to lab equipment at Belkin's expert's office:



*Figure 7: Test 2 Setup*

(**Ex. Q** at Belkin_GR_22.)

This is an action in which performance of consumer products is squarely at issue. Gromov is entitled to inspect and test an exemplar unit from every model in Belkin's range.

**Issue 7:**   **Belkin did not fully answer interrogatory 1, regarding product characteristics.**

**Requests affected:**   **Interrogatory 1**

Interrogatory 1 sought basic performance characteristics about Belkin's power banks: their "name, model number, SKU number, basic characteristics including stated capacity and output energy, and the first and last month in which the model was distributed to anyone by Belkin."

Belkin only answered this as to the Pocket Power 10000. It did not provide the stated capacity or the output energy for this device—again, something Belkin knows and that is a core question in this action, because Gromov's theory is that the output energy is much lower than the stated capacity. As shown in this motion, Belkin has test results showing only a 6070 mAh output energy, **Ex. R** at BELKIN-32, whereas Belkin's box claims this as a 10000 mAh device, Compl. ¶ 41.

Belkin also did not provide the end date of distribution for this product, which is relevant to class definition issues.

Belkin should be required to answer this interrogatory fully and to do so as to each of its models.

**Issue 8:**   **Belkin refused to produce sales or financial information.**

**Requests affected:**   **RFP 20–23**

These requests sought sales data of Belkin units (RFP 20), sales data created by third parties (RFP 21), financial reports and other sales information about Belkin power banks (RFP 22), and information about retailers' names and sales volumes (RFP 23). Belkin promised to produce certain unit sales data (RFP 20) under a protective order (which it still has not sought from the

Court), but refused to produce any of the other documents. At the June 9 meet-and-confer, Belkin's lawyers agreed to come back on this issue, but it has not done so.

Gromov alleges a large, multi-state class. It will be incumbent on Gromov, at the class certification stage, to come forward with evidence of sufficient numerosity to establish that class. Moreover, the sales information sought is relevant to establishing classwide damages. This militates production of the sales information demanded by RFPs 20–23.

Regarding the names of retailers, their geographic distribution, and the units sold, that information is relevant to overall sales as well as discovering—probably under subpoena—the average retail price. Retail price is something Belkin expressly disclaimed having. (**Ex. C**, response to interrogatory 3: "Belkin lacks visibility into the average retail price, as retailers set their own pricing.") Therefore, Belkin should be ordered to give Gromov the retailer data sought by RFP 23.

Further, it is likely that damages experts on one side of this case or the other will rely on actual pricing data and sales data in estimating a fair price for the Belkin products if they were accurately labeled—which is again relevant to damages and a calculation of Belkin's ill-gotten profits. The sales data sought in these four RFPs is necessary to conduct that analysis.

Gromov is willing to entertain discussions about protection—although, again, there haven't been any useful discussions and the last word from Belkin was "we will get back to you" on July 7. (**Ex. M**.) Belkin should be ordered to produce these documents.

**Issue 9:** **Belkin's reference to IATA guidelines, without producing them or identifying them, is meaningless.**

**Requests at issue: RFP 6; interrogatories 4, 5, 7**

RFP 6 sought "industry standards." Among Belkin's objections was this response: "The International Air Transport Association ('IATA') publishes guidelines on the labeling of power banks using lithium battery cells, which are accessible at the IATA's website."

"You go Google it yourself" is not a valid response to a request for production of documents. Even if it were, we know that Gromov's power bank was designed and developed during 2017 and whatever is on IATA's web site in 2023 is not necessarily what Belkin had in its files then. If that's the document Belkin means, Gromov is entitled to it.

Gromov is entitled to production of all of the actual documents Belkin relies on when it claims there are industry standards governing its products. (Particularly standards coming from a wholly different industry. Belkin doesn't point to a single standard from the *electronics* industry.) This is relevant to Belkin's defense that mislabeling a power bank is an industry practice.

Similarly, Belkin's answers to interrogatories 4, 5, and 7 are so vague as to be useless. Belkin should be ordered to serve a response sufficient to identify the standards Belkin relies on in this action.

**Issue 10:** **Belkin gives answers "subject to and without waiving" objections. Belkin must either answer or object and cannot have it both ways.**

**Requests at issue:** **Generally all, because Belkin relies on "general objections" throughout;**
**Specifically: RFPs 1–3, 5–20, 24, interrogatories 1, 3–17**

In all of these responses, Belkin serves one or more objections, stands on them, and then attempts to give an answer "subject to and without waiving" all of those objections. As an

example, interrogatory 10 is objectionable, Belkin says, because its phrasing makes it "vague and ambiguous." Nevertheless, Belkin goes on to answer the interrogatory.

As another example, RFP 12 sought marketing materials; Belkin made at least ten separate objections (including "protected by the attorney-client privilege and/or the attorney work-product doctrine and/or other applicable privilege") and then answered that there were no responsive documents.

The problem with "subject to and without waiving"-type answers is that they are too slippery to mean anything. Gromov is entitled to fair answers to his fair requests. If any discovery request is *truly* vague or ambiguous, Belkin has no business answering it, because Belkin can't understand it. Belkin must object. By both answering and objecting, Belkin has left itself an escape hatch to say, "Well, we said there were no responsive documents, but we did object to that request entirely." This is not fair pool.

The relevant Rules do not allow a party to both object *and* answer. Rule 33(b)(3) and (4); Rule 34(b)(2)(B) ("the response must either state that inspection and related activities will be permitted as requested *or* state with specificity the grounds for objecting to the request, including the reasons"); Rule 34(b)(2)(C) ("An objection must state whether any responsive materials are being withheld on the basis of that objection."). At the meet-and-confer, Belkin refused to give an answer that satisfies Rule 34(b)(2)(C).

Further, many of the requests where Belkin did "agree" to produce documents, e.g., RFP 3, are also requests where Belkin maintains a "subject to and without waiving" objection. When Belkin finally completes its production, how will Gromov know it is a full one?

The following authorities support the Plaintiffs:

- "A party cannot object to an interrogatory or request for production, and, at the same time, answer the request for production in the same response. If a party does this, the objection is waived. There is no authority in the Federal Rules of Civil Procedure for reserving objections. Parties have a duty either to answer discovery or object to it." *Jones v. Forrest City Grocery, Inc.,* No. 4:06CV00944 (E.D. Ark. Mar. 16, 2007).

- Wright, Miller & Marcus, *Federal Practice and Procedure: Civil* § 2173: "A voluntary answer to an interrogatory is also a waiver of the objection."

- "Such an objection and answer preserves nothing and serves only to waste the time and resources of both the Parties and the Court. Further, such practice leaves the requesting Party uncertain as to whether the question has actually been fully answered or whether only a portion of the question has been answered." *Consumer Elec. Assoc. v. Compras and Buys Magazine, Inc.*, No. 08-21085-CIV, 2008 WL 4327253 at *3 (S.D. Fla. Sept. 18, 2008).

- "[T]he practice of responding to interrogatories and documents requests 'subject to' and/or 'without waiving' objections is 'manifestly confusing (at best) and misleading (at worse), and has no basis at all in the Federal Rules of Civil Procedure.'" Heller v. City of Dallas, 303 F.R.D. 466, 486–87 (N.D. Tex. 2014).

- "Without this information, Plaintiff is left guessing as to whether Defendant has produced all documents, or only produced some documents and withheld others on the basis of privilege." *Pro Fit Mgmt., Inc. v. Lady of Am. Franchise Corp.*, No. 08-CV-2662, 2011 WL 939226, at *9 (D. Kan. Feb. 25, 2011).

Belkin should be ordered to amend all of these responses in line with the Rules—either with clear answers, or with valid objections. Or better, the Court should overrule all of Belkin's objections for the reasons stated elsewhere in this motion and Belkin should just be ordered to serve clear answers. In any event, Belkin should give no answer that is hedged with an objection.

### Issue 11: Belkin makes boilerplate objections that lack basis in the real world and are not substantiated with facts. They are just obstructionism.

**Requests at issue:** RFPs 1–23, interrogatories 1–7, 9–14, 16–17

In all of these discovery responses, Belkin reiterates boilerplate in these words: "In addition, Belkin objects to this Request because it is overbroad and unduly burdensome. This Request also

seeks information that is neither relevant to the claims or defenses of any party, nor proportional to the needs of the case."

These objections should be overruled—mainly because their repetition and emptiness shows that there is no real-world factual basis to assert any of them.

Also, there is not sufficient information presented with these objections to sustain them, and thus they must be overruled. A naked assertion of burdensomeness, without a showing as to the scope of the burden, is insufficient. "On the contrary, the party resisting the discovery 'must show specifically . . . how each interrogatory is not relevant or how each question is overly broad, burdensome or oppressive'." *Joseph v. Harris Corp.*, 677 F.2d 985, 992 (3d Cir. 1982). This simply isn't done here.

Gromov's requests are not burdensome or disproportionate. Just as to the three "Worm" models—the Pocket Power 5000, 10000, and 15000—Belkin estimated annual sales of 650,000 units. (**Ex. N** at BELKIN-238.) Even ignoring the "two dozen" other models Belkin discloses in every objection to this discovery, that is easily millions of units sold at a retail cost of perhaps $20–35—with total revenue to Belkin, over the model life of these units in the tens of millions. Even if you figure that the class alleged does not contain all 50 states, this is still easily a multi-million-dollar action, and therefore it is not burdensome for Belkin to, *e.g.*, search for its org charts (RFP 2), provide the names of those two dozen models (interrogatory 1), and so on.

Belkin's final objection here is to relevance, which is frankly offensive to the Rules. Consider RFP 5, seeking testing data. This is directly relevant to product underperformance, which is the whole basis of this action. Plainly Belkin's internal tests are relevant to the action. But Belkin says they are not.

Consider also RFP 4, where Belkin says the claims in the case "relate to the representations on the labels/packaging and advertisement. It is unclear how the battery pack's design specifications, drawings, and parts list relate to these issues." This makes no sense; *of course* the composition of the power bank, including its design and parts, relate to the action. Belkin takes the position that the "10000" in the model name "refers to the capacity of the power bank's internal lithium polymer battery cell." (Interrogatory 8.) But yet, Belkin objects to producing documents under RFP 4 that would describe that cell.

All of the boilerplate objections identified here should be overruled.

**Issue 12:  Belkin asserts privileges that have no basis in law and fails to support its privilege assertions.**

**Requests at issue:  All, because of general objections**
**Specifically: RFP 5–13, 19–20, 22**

In these responses, Belkin expressly states that one or more privileges is a bar to producing documents. For example, RFP 5 asked about external factors, such as industry standards, which led Belkin to label its power banks as it does. Belkin objected "to the extent the term, '[a]ll documents,' seeks to elicit information subject to and protected by the attorney-client privilege and/or the attorney work-product doctrine and/or other applicable privilege."

In several other requests other than the ones listed in the header, Belkin refers to producing "non-privileged" documents, again implying that it has a privilege to defend. And as to *all* requests, Belkin served its general objection no. 3, which is a generic defense of privilege also.

But Belkin failed to "expressly make the claim" and "describe the nature of the documents, communications, or tangible things not produced or disclosed" sufficient to assess any privilege from discovery. Rule 26(b)(5)(ii). In fact Belkin has produced no privilege log, not in April, not in

23

June, and not now. Gromov has asked for it, including in his June 29 status report. (ECF No. 34 at 4.)

It is hard to see how an industry standard external to Belkin (RFP 5) is even privileged in the first place.

Given Belkin's failure to make the claim of privilege, or to substantiate it, and given the length of time Belkin has wrongly given itself to complete its own production of documents, the Court should now order that Belkin has waived all privileges and that all claims of privilege are struck. The Court should also overrule general objection no. 3. Otherwise, Belkin's current answers will leave Gromov guessing whether the production of documents he will ultimately get has had documents withheld on the basis of some unnamed privilege.

### Issue 13: Belkin did not fairly admit or deny two of Gromov's requests for admissions.

### Requests at issue: RFAs 1–2

Gromov tendered two requests for admissions.

RFA 1 sought to have Belkin admit that the documents attached to the RFA were its entire document production in *Miley*. Belkin objected "on the grounds that it is overbroad and unduly burdensome to require Belkin to review Exhibit A page-by-page and word-by-word" with *Miley*. Belkin then gave a hedged response and attempted to "reserve[] the right to raise challenges to these documents at a later time."

RFA 2 sought to have Belkin admit that the attached documents attached to the RFA were Belkin's discovery responses in *Miley*. Belkin's objection and answer were similar to RFA 1.

Belkin's objections and answers leave Gromov without a clean response from Belkin that the documents are, in fact, authentic. While there is no reason a lawyer should have to go word by

word through a thousand pages—the parties ought to be able to craft a commonsense stipulation—Gromov is entitled to a complete, non-objected-to answer to the question: *are these documents authentic?*

Belkin should be ordered to admit both RFAs, or propose a fair procedure to eliminate its concern. It is not Gromov's fault that the record consists of many pages.

**Issue 14:** **Belkin served general objections to defined terms, which are clear and unambiguous.**

**Requests affected:** **All**

All of Belkin's responses were served subject to general objections to terms that Gromov defined. (Gromov's definitions were defined in **Ex. A**, at 1–3.) Each of those objections is meritless. Gromov cites each definition here, then each Belkin objection, and then explains why the objection should be overruled.

At the outset, the Court can resolve this issue by simply striking all of Belkin's general objections, as Magistrate Judge Kim has done in the *Geske* action, No. 1:19-cv-5170, Docket 81 (Mar. 5, 2023).

These objections infect every part of Belkin's responses, such that Gromov cannot rely on any response of Belkin's because Belkin has objected to the very form of the request.

> **Gromov's definition.** A "power bank" means any portable battery designed to be carried by a consumer and primarily intended to charge another battery-powered device carried by that consumer. As to Belkin, power banks includes the Belkin Pocket Power 10000 but also all include any other device meeting this description and marketed, distributed, sold, or otherwise put out by Belkin. References to a "power bank" does not mean only Belkin power banks; this term can also include competitors' models and can also include the concept of a power bank in the abstract.

> **Belkin Objection No. 10.** Belkin objects to the definition of "power bank" on the grounds that it is vague and ambiguous because, among other things, Plaintiff states that this term "can also include the concept of a power bank in the abstract." The definition is also overly broad, unduly burdensome, seeks information that is not relevant to any claim or defense at issue in this dispute, and is not proportional to the needs of the case, because it encompasses power banks not at issue in this action, including those manufactured by other companies.

Belkin's objection that "power bank" is a vague or ambiguous term is nonsensical, particularly in light of Belkin's repeat admission that it manufactures "over two dozen" models. Belkin knows what a power bank is; everyone does.

It is not a good objection that Gromov defines the term to include competitors' models. Indeed, reference to competitor models is fully appropriate. At trial, Gromov intends to show the jury the mislabeled Belkin products and "good" "Brand X" products that do not mislead their purchasers. Electronics companies monitor their competitors' products very closely—Belkin refers expressly to "our competitor" in the Executive Summary on mislabeling, for example, **Ex. H**—and it is appropriate for Gromov to ask Belkin what it knows about competitors' products. Similarly, where Belkin relies on industry standards, that argument inherently turns on competing models, and they can be a focus of discovery. Therefore, Belkin is wrong to argue irrelevance, burden, disproportionality and the like on the basis that competing models don't matter—they do.

Finally, most of Gromov's discovery requests are targeted right at Belkin, not "power banks in the abstract." *E.g.*, interrogatory 1 ("all power banks put out by Belkin"), interrogatory 3 (state the price of "each Belkin power bank").

> **Gromov's definition.** "Charging statements" means any representation, made anywhere by Belkin, about the ability of a power bank to charge any portable electronic device and how the

power bank's charge can affect a portable electronic device's charge. This includes statements: referring to mAh amounts; promising that a certain number of charges can be given to other devices; about power banks' ability to operate for a certain amount of time; comparisons to charging ability of competitor power banks; and all other statements concerning performance.

**Belkin Objection No. 11.** Belkin objects to the definition of "Charging statements" on the grounds that it is vague and ambiguous, particularly with respect to the phrase "how the power bank's charge can affect a portable electronic device's charge." The definition is also overly broad, and unduly burdensome because, among other things, it encompasses "all other statements concerning performance."

Belkin's objection should be overruled. There is just nothing vague or ambiguous about this definition. The phrase "how the power bank's charge can affect a portable electronic device's charge" refers to the core function of a power bank: to charge another device.



The Court should also note that Belkin *does* make express warranties about these matters. Compl. ¶ 41 shows the exterior of a Belkin package (image at right). The small print at the bottom says "Charge up to 3 times," referring to an iPhone. These are examples of "charging statements"—the core promise of the device's capabilities—and there is nothing vague about it.

> **Gromov's definition.** "Output energy" means energy measured in milliampere-hours, or mAh, that a portable electronic device can withdraw from a fully charged power bank.

> **Belkin Objection No. 12.** Belkin objects to the definition of "Output energy" on the grounds that it is vague and ambiguous, overly broad, unduly burdensome, and is not proportionate to the needs of the case, because it is defined as the "energy . . . that a

portable electronic device can withdraw from a fully charged power bank." In addition, this definition makes the interrogatories difficult to answer because various factors relevant to "output energy" are unknown, including, but not limited to, the type and model of the portable electronic device being used, the age and condition of that device, and external conditions, such as temperature at the time of use.

The first sentence of Belkin's objection is tautological and Gromov does not understand the problem. The crux of this case is that the charging statements promise 10000 mAh of power, but the actual output energy is much lower—something Belkin internally admits. (**Ex. H** at BELKIN-779, showing actual values in the 50–60% range.) How is this definition overbroad, burdensome, or disproportionate?

The second sentence of Belkin's objection is wrong. "Output energy," as defined here, means how much energy the Belkin product will put out. That is wholly agnostic to the type of device being charged, or its temperature, or so on. The Belkin product puts out whatever it puts out—what the receiving product does with that "juice" is another story. That is why you can measure Belkin power bank performance with a device like a lab meter—just like Belkin's subcontractor did in 2017 and found that the 10000 mAh model produces 6070 mAh of output energy. (**Ex. R** at BELKIN-32. The Court can rely on this number, because **Ex. R** is the Intertek report dated May 3, 2017—which Belkin itself adopts in its own answer to interrogatory 14.)

By blaming its misleading performance on the age of a consumer's device, Belkin is attempting to mislead Gromov and the Court. "Output energy" is defined this way expressly to exclude such outside factors and get to the heart of the issues.

Therefore, the Court should overrule this objection entirely.

> **Gromov's definition.** "Stated capacity" means the amount of energy, measured in mAh, that Belkin represents is a measure of capacity, via any representation concerning its power banks.

> Examples of mAh representations include "10000 mAh," "10,000," or "10K."
>
> **Belkin Objection No. 13.** Belkin objects to the definition of "Stated capacity" on the grounds that it is vague and ambiguous, particularly with respect to the phrase "via any representation."

There is nothing vague or ambiguous about the meaning of "any representation" and this objection is meritless.

> **Gromov's definition.** "Label" means all words, pictures, and other symbols placed on the outside of a power bank's package.
>
> **Gromov's definition.** "Labeling" means all written, graphic, or other matter—in any form, including print or electronic—associated with a power bank, and created or distributed in any way by Belkin. Labeling includes the label. Labeling includes materials not affixed directly to the package, including marketing materials (brochures, web sites, advertising, etc.).
>
> **Belkin Objection No. 14.** Belkin objects to the definition of "Labeling" on the grounds that is vague and ambiguous, including as to the phrases, "associated with a power bank" and "created or distributed in any way."

Similarly, there is nothing objectionable about these definitions, they are not vague and ambiguous, and this objection should be overruled.

The Court should overrule all of these general objections and direct Belkin to answer interrogatories and RFPs that relied on such general objections. This would particularly affect the answer to interrogatories 4, 5, 7, 9–13, all of which contain hedges about "output energy" that Gromov's definition was intended to forestall.

## III. Conclusion.

Gromov seeks the relief stated in each "issue" listed above in the form of an order compelling Belkin to make discovery.

Gromov also urges an in-person discovery conference at any time if the Court would find that helpful to considering the issues.

Respectfully submitted,

Date: August 2, 2023

/s/ William F. Cash III

William F. Cash III (Ill. Bar No. 6330856)
bcash@levinlaw.com
Matthew D. Schultz (*pro hac vice*)
mschultz@levinlaw.com
Scott Warrick (*pro hac vice*)
swarrick@levinlaw.com
**LEVIN, PAPANTONIO, RAFFERTY,
PROCTOR, BUCHANAN, O'BRIEN, BARR
& MOUGEY, P.A.**
316 South Baylen Street, Suite 600
Pensacola, FL 32502
Phone: 850-435-7059

Seyed Abbas Kazerounian (Ill. Bar No. 6316129)
ak@kazlg.com
**KAZEROUNI LAW GROUP, APC**
245 Fischer Avenue, Unit D1
Costa Mesa, CA 92626
Phone: 800-400-6808

Jason A. Ibey (Bar. No. 16691)
jason@kazlg.com
**KAZEROUNI LAW GROUP, APC**
321 N. Mall Drive, Suite R108
St. George, Utah 84790
Phone: 800-400-6808

D. Greg Blankinship (*pro hac vice*)
gblankinship@fbfglaw.com
Bradley F. Silverman (*pro hac vice*)
bsilverman@fbfglaw.com
**FINKELSTEIN, BLANKINSHIP,
FREI-PEARSON & GARBER, LLP**
1 North Broadway, Suite 900
White Plains, NY 10601
Phone: 914-298-3290

*Attorneys for Plaintiff Dennis Gromov*

## CERTIFICATE UNDER LOCAL RULE 37.2

Gromov and Belkin conferred on the issues raised in this motion by phone on June 9, 2023 for about two hours. The attendees were Scott Warrick, representing Gromov, and Nancy Sims, Patricia Mathy, and Ed Totino, representing Belkin. This conference consisted of good-faith attempts to resolve the differences, but the parties were unable to reach an accord.

Belkin says this was a full conference: "The parties spent over an hour discussing the perceived deficiencies in each side's discovery responses. The call ended cordially with both sides agreeing to look into certain issues before reverting back." (ECF 34, Joint Status Report, at 3.)

The parties have also conferred on other issues, such as the ones discussed on pages 1–2, and on Belkin's request for a protective order (again, **Ex. M**).

Belkin did not provide any substantive response after the June 9 conference, nor has it amended any of its answers or produced any documents other than the 38 pages discussed on pages 2–3 of this motion.

/s/ William F. Cash III