**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| DENNIS GROMOV, individually and on behalf of all other similarly situated, ) ) ) | |
| Plaintiff, ) ) | Case No. 1:22-cv-06918 |
| v. ) ) | Hon. Franklin U. Valderrama |
| BELKIN INTERNATIONAL, INC., ) ) | Magistrate Judge Gabriel A. Fuentes |
| Defendant. ) ) | |

**DEFENDANT BELKIN INTERNATIONAL, INC.'S
MOTION FOR ENTRY OF ORDER RE: TESTING OF PLAINTIFF'S SAMSUNG
GALAXY S6 EDGE PHONE**

Defendant Belkin International, Inc. ("Belkin"), by and through its undersigned counsel and pursuant to Fed. R. Civ. P. 37(a) and the Court's prior orders (Dkt. Nos. 85, 95, 100, 106 and 108), hereby moves this Court to confirm and enforce its prior order that the mobile phone that Plaintiff Dennis Gromov ("Plaintiff") used in generating his allegations in the complaint shall be provided to Belkin for testing. In support of its motion, Belkin states as follows:

## I. INTRODUCTION

The Court ordered on February 28 that Belkin is entitled to test the mobile phone that Plaintiff used when generating the allegations in the complaint, a Samsung Galaxy S6 Edge. (Dkt. 85.) Plaintiff has since upgraded his phone and has not used the device that will be tested as his personal phone for more than three years. (Ex. 2, Gromov Depo. Tr. at 20:16-21:19, 75:17-76:13.)[1]

On March 21, Belkin disclosed the testing that it wished to do:

1. fully charging the power bank using standard charger

2. completely discharging the phone

3. connecting a USB-C cable or micro-USB cable between the power bank and the phone

4. using a USB-C or micro-USB male to female adapter board with exposed terminals to connect a current probe to measure the current and a voltage probe to measure the voltage

5. using a data logger to calculate the capacity and watt-hours placed into the phone.

(Ex. 3 at 2.)

That process was then explained to the Court at the March 22 hearing. (Ex. 4 at 21.)

---

[1] Exhibits referenced herein are attached to the Declaration of Michael T. Boardman ("Boardman Decl.") submitted concurrently.

1

Since that time, Plaintiff has repeatedly raised various vaguely-asserted objections to moving forward with testing, none of which has merit. Attempting nonetheless to address Plaintiff's concerns, Belkin has made multiple good faith efforts to meet and confer and answered all of Plaintiff's questions (to the extent they were questions and not rhetorical or hypothetical statements), but nothing has satisfied Plaintiff. Through this back-and-forth, it has become increasingly clear that Plaintiff's "concerns" about the test protocol are not designed to facilitate a meaningful discussion about how to test Plaintiff's phone, but are instead directed toward Plaintiff's ultimate goal of obstructing discovery and convincing the Court to reconsider its order that the phone be tested at all. Such arguments are inappropriate and, in the Court's words, a "frolic[king] detour" because orders are not "first drafts." (Ex. 4 at 37-38)

All of the purported concerns raised by Plaintiff are purely hypothetical. There is no basis to believe, for example, that testing would damage the device in any way or that any personal information would be disclosed. Belkin as made clear from the beginning that neither of those things would occur. In fact, Plaintiff's expressed concerns are likely not even authentic, because Belkin offered that Plaintiff could wipe his phone, which has not been used for 3 years, before the testing, but Plaintiff rejected that proposal, demonstrating that privacy is not really important to Plaintiff. The specific testing requested by Belkin is simple and described in Exhibit 1. As the Court will see, the test involves simply plugging the phone into a charging cable and recording the amount of power that is transferred and stored on the phone. Given the lack of any legitimate objections raised by Plaintiff, the Court should approve this testing without further delay.

## II.  RELEVANT FACTUAL BACKGROUND

On February 28, 2024, the Court ordered that Plaintiff make the Samsung phone that he used to create the allegations in the complaint available for testing. (Dkt. 85.) In response to

Plaintiff's raising concerns about the scope and effect of testing at the March 22 status conference, the Court ordered the parties to meet and confer further regarding a testing protocol and to submit a joint or contested motion to the Court. (Dkt. 95.) The deadline to file a motion has been extended multiple times to accommodate the parties' discussions. (Dkt. Nos. 100, 106, 108.) The history of those discussions is telling.

First, Plaintiff voiced various vague concerns about privacy. (Dkt. 88 at 5-7.) Belkin addressed those concerns by suggesting that the phone be provided restored to factory settings -- in other words, without any personal data on the device. (*Id*.) Plaintiff will not agree to restore the phone to factory settings, claiming that it is destructive, yet Plaintiff provided no specific information suggesting that any data cannot be transferred to a different device. Indeed, it already has been transferred as the Plaintiff upgraded his phone more than three years ago. (Ex. 2 at 20:16-21:19, 75:17-76:13) The fact that Plaintiff would not agree to Belkin's offer demonstrates that Plaintiff's purported privacy concern is specious and asserted only to obstruct discovery.

Plaintiff also refused to accept Belkin's representations that, if the device is provided without being restored, the testing would be done without accessing user data because testing could be done without unlocking the device. (Ex. 6 at 1.) Specifically, Plaintiff's counsel contended that, contrary to Belkin's stated intentions, Belkin was somehow primed to covertly unlock the phone and obtain Plaintiff's personal information by hacking it with sophisticated technology that is apparently not accessible even to the phone's manufacturers or the FBI. (Boardman Decl. at ¶ 8.) The basis for this contention was that Plaintiff's counsel read a news story at some point about the FBI hiring an Israeli company to manually unlock a criminal defendant's phone because the phone contained necessary evidence in the case and it could not

3

otherwise be obtained without access to the defendant's passcode. (*Id*.) Belkin assured Plaintiff that it would not engage these Israeli hackers, or otherwise seek to access any personal data on the phone in any way. (*Id*.) But Plaintiff is still not satisfied.

Next, Plaintiff's counsel demanded that Belkin provide details on the identity and qualifications of its expert prior to the expert disclosure deadline in order to be assured that the test will not be done by "someone with a jumper cable in a garage" and risk harm to the device. (Boardman Decl. at ¶ 9.) Belkin assured counsel that this was not the case. (*Id*.) Belkin will disclose its experts in connection with the schedule set by the Court and the Federal Rules. Plaintiff is not entitled to early expert discovery simply because it can make up a ridiculous hypothetical horror story.

Then, in response to Belkin's request that the device be provided without background applications running,[2] Plaintiff contended that testing needed to somehow take into consideration the potential effects of various unidentified security software updates. (Exs. 3, 5, 6, 7.) But Plaintiff could not identify any such updates in particular or what effect they may have, and it remains unclear which such updates cause Plaintiff concern. (Ex. 8 at 2.)

Plaintiff then contended that any testing would be prejudicial because charging and discharging the phone "will permanently affect the battery" such that "[i]t could constitute spoliation if we were to run the same test." (Ex. 8 at 4.) But again, Plaintiff did not (and admittedly cannot) provide any information about what impact, if any, the testing might actually have on the phone or its battery. Plaintiff has not provided any information about the current state of the phone battery, how many times it has been charged and discharged, what security features are installed or not installed on the phone, which operating system was running when

---

[2] Avoiding complications related to identifying what applications are running on the phone was one of the reasons that Belkin requested that the phone be restored to its factory settings.

Plaintiff used the phone to create the complaint's allegations, or even what operating system is currently running. (*Id*. at 2-3) The potential "spoliation" that Plaintiff asserts is simply based on "common sense" that "batteries wear out." (*Id*. at 3.)

Finally, Plaintiff raised a "new concern" this week that "rapid testing" (which he does not define) is somehow relevant to the condition of the battery. As evidence, Plaintiff provided a link to an internet forum related to a different phone – the Google Pixel – and which, in any event, does not discuss "rapid charging." (*Id*.) Again, Plaintiff identifies no actual effects from "rapid charging" – whatever that is – or why it might matter. Plaintiff's obstruction must be brought to an end.

### III. ARGUMENT

Based on the Court's orders and the parties' discussions, Belkin prepared a proposed protocol for testing of Plaintiff's phone, a copy of which is included herewith as Exhibit 1. Given the lack of any reasonable objection by Plaintiff, Belkin respectfully requests that the Court order that the phone be turned over for testing consistent with that protocol.

#### A. Plaintiff's Privacy Concerns Have Been Addressed.

Plaintiff's primary asserted reason for why testing cannot go forward is that sensitive information *may* exist on the device and the *possibility* that it may be accessed during the test. (Dkt. 88 at 5; Boardman Decl. at ¶¶ 7-8.) However, Plaintiff has provided no detail as to what information might be on the device that is so sensitive that it could not be covered by the Protective Order if inadvertently disclosed. Indeed, the device in question is not even the device that Plaintiff currently uses as a phone. (Ex. 2 at 20:16-21:19, 75:17-76:13) After filing the complaint in this case, Plaintiff purchased a new device and uses that new device as his personal cell phone, apparently retaining the old phone only for purposes of this litigation. (*Id*.)

5

Moreover, Belkin has repeatedly assured Plaintiff that the test will gather only information about charging and discharging of the device and will not collect or identify ***any*** personal data stored on the device. (Boardman Decl. at ¶ 8; Ex. 6 at 1.) In response to Plaintiff's raising this concern, Belkin suggested months ago that the device be restored to its factory settings. (Dkt. 88 at 8.) That way, all of Plaintiff's personal data would be wiped and the device would not need to be unlocked or accessed at all during the test other than to plug in a charging cable and observe the information on the locked screen regarding battery charge percentage. (*Id.*; Exs. 3, 6, 8.)

Recognizing that this proposal would solve Plaintiff's purported privacy concern, Plaintiff then pivoted to objecting that a factory reset is inappropriate because it is "destructive." According to Plaintiff, uploading the data currently on the phone to cloud storage and then downloading that same data later would somehow result in permanent loss. (Ex. 8.) Plaintiff has never disclosed what data might be subject to loss or why. As discussed with the Court at the March 22 hearing, transferring data between devices is a standard process that all of us have done without destroying that data. Indeed, Plaintiff himself likely already transferred the relevant data from his old phone to the phone that he is currently using as part of his transitioning devices. Plaintiff has offered nothing to suggest that the private data about which he is concerned has not already been backed up and transferred to his new device.

Despite Plaintiff's speculation about private information being accessed on the device or somehow lost being at best wildly overblown, Belkin offered a possibility that Plaintiff provide the device without restoring its settings, so long as he certifies in a reliable way that background applications running on the device had been terminated. That way, the device could be provided in its password-protected state and with wi-fi turned off, such that no data would be input or

6

transmitted from the device. In that locked condition, no one but Plaintiff (including Samsung and the U.S. Government) would be able to access the phone's contents. (Ex. 8.)

But even that was not good enough for Plaintiff, who continued to raise privacy concerns that border on the farcical. For example, Plaintiff has demanded assurance that Belkin's expert will not ship the device to hackers in Israel who have allegedly been able to defeat security features on mobile phones in ways that even the FBI cannot manage. (Boardman Decl. at ¶ 8.) Next, Plaintiff demanded that the test be conducted in a Faraday cage, to avoid any electrical interference from wi-fi or cell phone signals, despite the device not currently being connected to any phone network and there clearly being no effect on the ability of the device to charge and discharge by it sitting in an ordinary environment. (*Id*. at ¶ 10; Ex. 6.) Plaintiff has offered no bases for these demands and unsupported concerns.

Plaintiff also objects to restoring the phone to its factory settings because unidentified "security updates" that may or may not include improvements to increase battery performance, may have been downloaded to the device at some point. (Ex. 8.) These supposed concerns, like the others, are speculative and unhelpful. Belkin has asked Plaintiff to identify the updates about which it is concerned and to identify the state of the device's software as it existed when the complaint was filed and today. (*Id*.) Plaintiff has been unable to do so. (*Id*.)

Attempting to bridge the gap and resolve Plaintiff's unreasonable privacy concerns and unwillingness to restore the phone to factory settings, Belkin has offered a solution: Plaintiff will provide the phone as-is, after disabling applications that can be disabled, switching off wi-fi and powering down the phone. Belkin's testing will not require unlocking the device or collecting any personal data and is not destructive. The testing requires nothing else be done to the phone other than to plug in a charging cord. Yet, Plaintiff still objects. Belkin respectfully

7

requests that the Court order that either (1) the phone be turned over restored to factory settings or (2) the phone be provided with background applications disabled, as described in Exhibit 1.

### B. Plaintiff's "Potential Spoliation" Objections Are Unsupported and Unreasonable.

Plaintiff has also sought to avoid testing by claiming that any testing that involved charging and discharging the phone would necessarily be destructive and prejudicial because batteries degrade over time. (Ex. 7 at 3-4.). But, again, Plaintiff has no actual support for this concern and seeks to create a dispute where none reasonably exists.

During the parties' meet and confer efforts, Belkin indicated that the preliminary testing plan would charge and discharge the phone between 5 and 10 times – the equivalent of Plaintiff using the phone for about an additional week. (Ex. 6.) Plaintiff responded that it could not agree to this because "[counsel's] information is that a battery cell can handle only 200-300 discharges before its performance degrades significantly." (Ex. 7 at 2.) Belkin then asked for what "information" Plaintiff was relying upon to make such a statement. (*Id*. at 1.) Plaintiff's counsel responded by pasting a chart from an unidentified source into an email and stating that "I don't swear by this graph, nor can I vouch for it, but this is the type of information available showing in the consumer press on how batteries can deplete with use." (Ex. 8 at 3.)

Plaintiff also has no information about the state of the phone when it was used to generate the allegations in the complaint, so that an assessment could be made of any performance differences. Plaintiff stated that he cannot provide any information about the battery's condition, how many charge cycles it has currently been subjected to, or any other details about the phone's current state. (*Id.*) When asked, for example, for information about the operating system being run now as compared to when the phone was used to generate the allegations of the complaint, Plaintiff's counsel stated not only that he did not know, but that "I don't think anyone could

8

know the version." (*Id*. at 2). When asked how many times the phone had previously been fully discharged, Plaintiff responded, "[n]o idea." (*Id*. at 4) Plaintiff's objection is based only on assertions that "it is just common sense" that "batteries wear out" in general. (*Id*. at 3.)

These generic and unsupported allegations are not sufficient to disregard the Court's prior order that the phone be tested. Nor do they provide any basis for modifying Belkin's proposed testing, as they do not even attempt to articulate any specific limitations that might be appropriate. Obviously, testing the phone's charging capability requires actually charging and discharging the phone. That process cannot be avoided. Therefore, any arguments that Plaintiff wishes to make that the phone was returned in a substantially different condition – notwithstanding his complete inability to provide evidence of its current condition – can be addressed in a rebuttal expert report. Hypothetical complaints of that nature cannot be a basis to avoid testing in the first instance.

Given that Plaintiff has been unable to offer *any* specifics that would justify or allow the parties to consider any particular restriction on the test in terms of the number of times the phone is charged, Plaintiff appears to object simply for the sake of objecting, in hopes that he can walk back the Court's prior order. As the Court explained at the last hearing, the Court's orders are final, not "first drafts." (Ex. 4 at 37.) Belkin's proposed testing should go forward without further delay.

C. **Plaintiff's "New Concern" About "Fast Charging" Is Similarly Unsubstantiated and Irrelevant.**

On April 19, Plaintiff's counsel for the first time raised "a new concern: when 'rapid charging' is used, that can accelerate the wear on a battery cell." (Ex. 8 at 4.) As evidence of this allegation, Plaintiff links to a support website for the Google Pixel phone Help Center.[3] It is

---

[3] "Get the most life from your Pixel phone battery," available at

9

not clear what part of that website is allegedly relevant because the term "rapid charging" is not anywhere on that page. Plaintiff also does not describe what is meant by "rapid charging, normal charging, or slow charging," or how any of those types of charging (to the extent they exist) may impact the phone. This "new concern," like the old ones, is just more speculation to which Belkin cannot meaningfully respond and is likely asserted just to obstruct discovery. It is unclear what Plaintiff's objection to that process actually is. As explained in the protocol, the phone will be connected to a Belkin power bank, which will charge the phone. This is what Plaintiff claims to have done before filing this case. Plaintiff has no real objection to that being done again.

## IV.     CONCLUSION

The Court has already ordered that Plaintiff's Samsung phone be tested in this litigation. Belkin has proposed a reasonable and simple test protocol to effectuate that order. Notwithstanding the Court clearly indicating that it is not inclined to reconsider its prior order, Plaintiff's counsel has done everything in their power to prevent the testing from going forward by presenting a series of shifting, hypothetical excuses that are all admittedly based on nothing but pure speculation. Consistent with its prior order that Plaintiff's Samsung phone be provided for testing, the Court should approve the testing proposed by Belkin and give Plaintiff a firm date on which to turn over his phone.

---

https://support.google.com/pixelphone/answer/6090612?hl=en

Dated:  April 26, 2024	Respectfully submitted,

By: */s/ Laura Kelly*

    Laura Kelly
    BAKER & MCKENZIE LLP
    300 East Randolph Street, Suite 5000
    Chicago, IL 60601
    Telephone: (312) 861-3700
    katelyn.vandoorne@bakermckenzie.com

    Edward Totino (admitted *pro hac vice*)
    Nancy Nguyen Sims (admitted *pro hac vice*)
    Michael Boardman (admitted *pro hac vice*)
    BAKER & MCKENZIE LLP
    10250 Constellation Blvd., Ste. 1850
    Los Angeles, CA 90067
    Telephone: (310) 210-4725
    edward.totino@bakermckenzie.com
    nancy.sims@bakermckenzie.com
    michael.boardman@bakermckenzie.com

    *Counsel for Defendant Belkin International, Inc.*