# EXHIBIT 4

1    **TRANSCRIBED FROM DIGITAL RECORDING**

2                    IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
3                          EASTERN DIVISION

4    DENNIS GROMOV, individually and        )
     on behalf of all others similarly      )
5    situated,                              ) Case No. 22 C 6918
                                            )
6                    Plaintiff,             )
                                            )
7            vs.                            )
                                            ) Chicago, Illinois
8    BELKIN INTERNATIONAL, INC.,            ) March 22, 2024
                                            ) 10:04 A.M.
9                    Defendant.             )

10

11                TRANSCRIPT OF PROCEEDINGS - Status
       BEFORE THE HONORABLE GABRIEL A. FUENTES, Magistrate Judge
12
     APPEARANCES:
13
     For the Plaintiff:        LEVIN PAPANTONIO RAFFERTY
14                             316 South Baylen Street
                               Suite 600
15                             Pensacola, Florida  32502
                               BY:  MR. WILLIAM F. CASH, III
16
     For the Defendant:        BAKER & McKENZIE LLP
17                             300 East Randolph Street
                               Suite 5000
18                             Chicago, Illinois  60601
                               BY:  MS. LAURA A. KELLY
19

20

21                    PAMELA S. WARREN, CSR, RPR
22                Official Court Reporter - Retired
                     23869 N. High Ridge Drive
23                 Lake Zurich, Illinois   60047
                          312.823.0001
24

25   **NOTE:  Please notify of correct speaker identification.**

1    THE COURT:  -- she'll be reasonable.

2    MS. KELLY:  Yes.

3    THE COURT:  And so if it is not reasonable, then you

4    have grounds to come in and, you know, have more motion

5    practice, spend more of your clients's money.  It doesn't sound

6    to me the greatest use of resources.  So hopefully we won't

7    have to see you again on that, you'll get the flexibility that

8    you are looking for.

9    So the final issue on my list today is the inspection

10   of the phone.  And it is last on my list because it is for me

11   the most difficult.  It looks like -- I don't know if we

12   analyze the applicability of the Miley protocol quite well

13   enough at least as to the phone.  And there is a concern about

14   personal information.  You know, this is a process that can be

15   difficult for the Court to supervise and difficult for the

16   Court to make sure that privacy interests are protected.

17   So let's see.  This is the plaintiff's phone, right

18   Mr. -- I almost called you Mr. Gromov.  Mr. Cash, it is the

19   plaintiff's phone.

20   MR. CASH:  Yes, sir.

21   THE COURT:  You know, I got to tell you, my reaction

22   to this is maybe that phone ought to be forensically imaged and

23   maybe the forensic image should be provided to a special master

24   and maybe the special master can make the determination and the

25   two of you can split the cost.  Because I don't think it is a

1    good thing for the Court to try to supervise.  We're only going

2    to have disagreements.  We're only going to have issues with

3    the privacy.

4            How about we -- I am trying to remember.  The term

5    special master, as of a very recent ABA resolution, is falling

6    out of favor because it contains some negative connotations.

7    So I guess we would say Court-appointed monitor might be a

8    better term.

9            So what do you think of me turning this over to a

10   monitor so it gets done and it gets done with everyone's

11   interests protected?  The Court monitor, he or she or they,

12   neutral.

13           What do you think, Mr. Cash?

14           MR. CASH:  The intent to examine the phone, as far as

15   I'm aware, has to do with the hardware and the software on the

16   phone.  And so I'm not sure that just imaging the phone and

17   going through the image would accomplish --

18           THE COURT:  Okay.  You can get a vendor.  Some vendor

19   can figure out exactly how and how much it will cost.

20           I think that cost also needs to be split.

21           So the vendor figures that out.

22           The data gets put into the hands of the monitor.  And

23   then the monitor decides what gets produced and what doesn't.

24           What do you think of that?

25           MR. CASH:  It is not the data they're after though, as

1    far as I understand.  And we got their protocol last night at

2    7:00 P.M.  It is about this long.  And we really have no detail

3    as to what it is they're trying to do after all this time,

4    but --

5                THE COURT:  Well, what about consistent with whatever

6    Rule 34 requests they have out there?  What's the applicable

7    Rule 34 request?

8                MR. CASH:  Is -- that we would make the production of

9    a thing.  And our objection is that we have privacy concerns.

10               THE COURT:  Well, wait, what information is relevant

11   to a claim or defense or proportional to the needs of the case

12   from this phone?  Do you have an understanding of that?

13               MR. CASH:  No, I really don't.

14               THE COURT:  Okay.

15               MR. CASH:  I mean, we have asked repeatedly what it is

16   that you're trying to do to test this phone.  What exactly do

17   you want to do to the phone?  We really don't know.

18               THE COURT:  Ms. Kelly is here.  Maybe she can tell us.

19               MS. KELLY:  Yes.  Your Honor, I -- if you'll permit

20   me, I would like to read from the protocol that was provided.

21   I think it elucidates a lot of answers to these questions.

22               THE COURT:  Yes.  But keep it in the context of the

23   Rule 34 requests.  What are you entitled to get is kind of the

24   first question.

25               MS. KELLY:  Right.

1          THE COURT:  The protocol is how we get there.

2          MS. KELLY:  Yes.  And, your Honor, where the plaintiff

3   has alleged that the device does not charge to the degree that

4   it is supposed to, this test is intended to evaluate exactly

5   that.

6          So the preliminary test process consists of fully

7   charging the power bank using a standard charger.  Completely

8   discharging this phone.  So draining the battery entirely.

9          Connecting a USB cable or micro USB cable between the

10  power bank and the phone.  Using a USB or micro USB adapter

11  board with exposed terminals to connect a current probe to

12  measure the current and the voltage probe to measure the

13  voltage.  And then using a data logger to calculate the

14  capacity and watt hours placed into the phone.

15         We have made clear this is not a test that involves

16  removing the phone battery.  This does not require removing the

17  case or otherwise modifying the device.

18         And so in terms of whether or not there is any

19  concerns of any destruction to the device in order to make

20  these, to counsel's point, hardware-related evaluations, that

21  is not to occur.

22         THE COURT:  Okay.

23         MS. KELLY:  In terms of the privacy concerns, we have

24  requested the device be restored to factory settings prior to

25  being tested in order to ensure that the testing is accurate.

1    That would mean there would be no apps running, there would be

2    nothing in the background.

3            THE COURT:  Okay.

4            MS. KELLY:  And it also would eliminate any concerns

5    related to privacy.

6            THE COURT:  So now I'm understanding that a little

7    better.

8            Mr. Cash, is there a problem with reducing the phone

9    to the factory settings so essentially everything is lost?

10           MR. CASH:  There is.

11           THE COURT:  Your client needs some of that stuff; is

12   that it?

13           MR. CASH:  Well, it is his phone.  It contains

14   sensitive information that belongs to him.  He's a 25-year-old

15   kid and his entire life is on this phone.

16           THE COURT:  Yeah.

17           MR. CASH:  If we --

18           THE COURT:  So I don't know.  Why do they think that

19   they can just turn it to factory settings and that's going to

20   be okay?

21           MR. CASH:  I don't think that --

22           THE COURT:  Okay.

23           MR. CASH:  Listen, if --

24           MS. KELLY:  Your Honor --

25           MR. CASH:  -- here's our --

1       THE COURT:  Okay.  You see how there is a disconnect.

2       MS. KELLY:  -- I think it's -- it has to do with -- we

3  have lost our phones in the past.  We have all had to update

4  our data on a new phone.  I myself am embarrassed to say, I

5  have dropped a number of phones and cracked them and had to

6  move it to a different device.

7       He is entirely capable, as you, your Honor, and I are

8  to put things -- to save things to the cloud.  Right?  And then

9  he could reinstall it on this exact device.  He could put it on

10  another device.  These are all options.

11       But to suggest that somehow we are wiping away his

12  (unintelligible) -- excuse me, wiping away his ability to

13  access this data, to retain it, to use it in fact even on this

14  device is simply false.

15       THE COURT:  Okay.

16       MR. CASH:  I do have a --

17       THE COURT:  So, Mr. Cash, why can't he just get

18  another phone from the Verizon store or wherever and transfer

19  the data over?  Give the old one to whatever vendor is going to

20  run these tests on it.  And then before doing that, the vendor

21  would restore it to factory settings so there would be no

22  private data on it.

23       What would be wrong with that?

24       MR. CASH:  Here's one of the problems with that.  This

25  is an Android phone.  And the Android operating system

1    routinely pushes updates that affect battery performance.  We

2    still don't really understand why they have to test this phone

3    versus any device that can pull 10,000 milliampere hours of

4    current.

5              THE COURT:  This phone versus any device that what?

6              MR. CASH:  You could test any device at all that pulls

7    10,000 milliampere hours and figure out if the device provides

8    it.

9              You could test a light bulb hooked up to a USB cable

10   and see how long the light runs if you want to drain the

11   battery pack.  There is nothing special about his phone, his

12   device.  And they haven't explained why that's relevant.

13             But to the extent that they're going to then come in

14   and argue and say, well, your phone, there is something weird

15   about your phone, that defeats class cert for you, or you

16   misused the battery in some way because your phone is special.

17   The software on the phone is part of the phone.  The way that

18   the Android operating system is installed, the battery updates

19   are then pushed over the years are part of the system.

20             And so if we're going to -- if they're going to come

21   in and say, well, his experience with the battery, you know, is

22   weird or unique, it is going to be based on whatever updates

23   are installed today.

24             If we wipe the phone, we're going to lose whatever

25   updates there are.  And when he restores it back, it may not be

1    the same configuration of the operating system that it was at

2    the time that he had it.

3          So if I want to perform the rebuttal test, they have

4    done a destructive test.  They have changed something about the

5    phone that we cannot get it back.

6          And they -- in order to register an Android phone

7    after you wipe it, you have to log in with a Google ID.  They

8    have not explained how when he puts his Google ID back onto the

9    phone, that's not going to resync his Gmail and all the other

10   stuff that's part of a Google account that comes over.

11         You can't get updates from the Google Android Play

12   Store without being logged in with a Google ID.  It is not

13   possible.  Someone has to do that.

14         I guess theoretically we could go out and make a blank

15   Google account that has nothing in it and do it that way.  But

16   they haven't proposed that.

17         So either way we go, whether we wipe the phone, it is

18   going to be destructive.  If we don't wipe the phone, which is

19   their other proposal, well, just unlock the phone and let us go

20   in and disable things.  They haven't told us which settings

21   they want to disable.  They haven't told us which background

22   apps they are trying to affect.

23         And phones are full of background apps.  There are

24   over a hundred processes that run on a modern phone, and there

25   are almost a million files on a default install of an Android

1  phone.

2      So you tell me how we're going to be able to preserve

3  all that, reverse the effects of whatever they have done, and

4  then do our own test if that's necessary.

5      And I guess where I'm lost is, I don't understand why

6  we have to test this phone at all when we could test the

7  light bulb or generic product or they could go to the Verizon

8  store and buy a fresh blank phone off the street.  That would

9  be cheaper, by the way, than hiring anybody else to do this.

10 Test it -- test it with a blank device that we can then get

11 that won't have privacy concerns.  But why they have to get

12 into this phone and cause him to do these changes.

13     And, look, you lost your phone, I have lost my phone.

14 But it is a hassle.  And you have to go in and change the

15 settings in every application.

16     It is not a one-button restore.  This imposes a cost

17 on him in terms of time, privacy.  And they haven't -- there

18 are some missing holes here.  They haven't told us who the

19 expert is going to be.

20     You know, in a Rule 35 exam, at least I would get to

21 know that the person is actually an MD doing the investigation,

22 doing the exam.  You get to at least know the qualifications of

23 the person doing the inspection.

24     They have refused to tell us.  We proposed that we be

25 present so we see what they are doing.  They have refused to

1    agree to that.

2              THE COURT:  Okay.

3              MR. CASH:  We just don't know what they want to do and

4    we don't know why they need to do it.

5              THE COURT:  So Ms. Kelly --

6              MS. KELLY:  Your Honor --

7              THE COURT:  -- why the plaintiff's phone?  And forget

8    for a minute about the inconvenience to him.  He's the

9    plaintiff.  He brought a lawsuit in a case.

10             But I am a little concerned about what Mr. Cash said

11   about if you perform this testing on this particular phone that

12   it may alter the phone in a way that maybe would prevent

13   plaintiff from doing maybe his own testing on it.  I don't know

14   that I have been assured by what you have told me so far that

15   that's not true.

16             So tell me, why not use some other phone or phones

17   that could be obtained, perhaps could be identical, and one you

18   run your tests on, and one is preserved for the defense to run

19   its tests on?  Why not do it that way?

20             MS. KELLY:  Your Honor --

21             THE COURT:  Why does it have to be his phone?

22             MS. KELLY:  Your Honor, a few things on this point.

23   One, I think it bears noting that your Honor has already ruled

24   on this and plaintiff is attempting to relitigate it.  In fact,

25   in your February 28th order --

1    THE COURT:  Yeah.

2    MS. KELLY:  -- you said, as an initial matter, we find

3    that both devices, the bank and phone, are relevant and must be

4    produced.

5    Putting that aside, your Honor, the plaintiff's phone

6    is the basis of his entire case.  All of his allegations are

7    tied to his use of this particular power bank and this

8    particular phone.

9    Defendants are entitled to make that evaluation as to

10   whether the allegations that plaintiff has presented are in

11   fact accurate.  And the only way to do that is to do that on

12   the device that plaintiff alleges he used and suffered the

13   purported losses related to.

14   Putting that aside, I think it is incorrect to suggest

15   that we are somehow destroying it or eliminating the

16   plaintiff's ability to retain stuff.  Again, I come back to the

17   fact that I have had to replace many a phone.  And contrary to

18   opposing counsel's suggestions, in many instances it is in fact

19   but one button to press and you can put it on another device

20   or, alternatively, you can leave it on the cloud and put it

21   back on the same device.

22   This is not an overly burdensome process.  The entire

23   phone industry is based on the ease with which your ability to

24   transfer your data from one phone to another.

25   So to me it is incorrect to suggest that somehow we

1    are eliminating his ability to access any of this data, to even

2    get the phone in the exact same layout that he had it in with

3    the exact same apps with the exact same data on his phone is

4    entirely possible.  I have done it countless times.

5            In fact, your Honor, I have tape on the back of this

6    phone because I have already dropped it.  But I have done this

7    enough times to know that this is a very simple process.  And

8    to suggest otherwise is simply incorrect.

9            THE COURT:  Okay.

10           MS. KELLY:  I would also add, with respect to the

11   expert piece of this, the deadline for the parties to disclose

12   experts, to designate experts, to disclose experts, to provide

13   reports has not yet come.  The parties are negotiating that

14   process.  And it is entirely premature for plaintiff to ask

15   defendants to provide that information at this juncture.

16           The concerns that have been provided to us are

17   destruction of the phone and privacy concerns, and that's what

18   this protocol correlates to.

19           In terms of identity of the expert, in terms of his

20   particular opinions, that is simply something that it is

21   premature for defendants to be forced to present at this time.

22           It is entirely possible that we would work with an

23   expert that we determine is a consulting expert with respect to

24   this analysis.  And then they wouldn't be entitled to that

25   information in the first instance.

1    So to make these requests for expert discovery at this

2  particular stage is problematic and really turns this process

3  on its head.

4    THE COURT:  Okay.  So I guess here's where I am on

5  this.  We did enter our previous order.  And I'm not going to

6  walk that back.

7    But if I recall correctly, to move things along and to

8  leave less room for further disagreement, I kind of imposed a

9  protocol on you based on what I had in front of me.

10   But plaintiff is saying -- defendant is saying that

11  protocol doesn't really work and so --

12   MS. KELLY:  Your Honor --

13   THE COURT:  -- really what you're doing, you're orally

14  moving for an alternative protocol, aren't you?

15   MS. KELLY:  No, your Honor.  To clarify, we are

16  speaking with respect to the power -- the phone as opposed to

17  the power bank.

18   THE COURT:  Okay.

19   MS. KELLY:  The power bank, that protocol, the Miley

20  protocol, and specifically the document we had laid out, which

21  is substantially similar to the Miley protocol --

22   THE COURT:  That's what I was referring to.

23   MS. KELLY:  -- that would stand with respect to the

24  power bank.

25   THE COURT:  I was referring to the phone as well.  The

1  problem is that there is not right now a workable protocol

2  that's been ordered for the phone, right?

3         MS. KELLY:  Right.  And that's what we're setting

4  here.

5         THE COURT:  Yeah.  That's why I think what you are

6  doing is you're making an oral motion to do that.  Or I am

7  probably -- I suppose that's my putting words in your mouth.

8         You're reporting to the Court that you haven't yet

9  been able to come to agreement on that.  We have been able to

10 hash it out substantially, but I think -- I want to be

11 respectful of Mr. Cash's concerns that he doesn't either

12 understand the protocol completely or he doesn't understand

13 completely what it is intended to accomplish and he has

14 concerns about preservation.

15        You know, I think those are things for the two of you

16 to try work out a little further since this got raised as a

17 concern in the status report, a concern today.

18        But I think for me to order anything, I would prefer

19 that it be through a joint motion or a contested motion.  And I

20 want that on file a week from today.  So you have time to

21 confer.  See if there is a way to agree on this protocol.

22 Maybe Mr. Cash will agree when he understands it a little bit

23 better.  He has had some questions about it.  Maybe he won't.

24        But I guess where I am coming down on the alternative

25 phone issue is, I'm hearing Ms. Kelly on that one.  He's a

1  plaintiff.  The issues in the complaint, I haven't heard you
2  deny that they relate to the phone that he now possesses.
3        MR. CASH:  Well --
4        THE COURT:  Or do you?
5        MR. CASH:  If I may be heard on that.  We do.  Our
6  complaint is that the battery pack does not put out 10,000
7  milliampere hours like it says on the package.
8        THE COURT:  Why shouldn't she be allowed to test that?
9        MR. CASH:  She can.  And she doesn't need his cell
10  phone to monitor the output coming off the battery pack.
11        THE COURT:  Because she can test another phone that
12  has the same battery pack?
13        MR. CASH:  Or a light bulb or a voltmeter --
14        THE COURT:  Yeah.
15        MR. CASH:  -- or any device at all that draws a
16  current.
17        THE COURT:  I think she wants to test his phone.  His
18  phone, his experience with that phone --
19        MR. CASH:  Sure.
20        THE COURT:  -- as far as I can figure out does form
21  the basis of his allegations.
22        MR. CASH:  But it is not the --
23        THE COURT:  So it is relevant to the subject matter of
24  the case.  It is relevant to claims and defenses.  It is not
25  disproportionate.  So that's why I ordered it before.

1    MR. CASH:  I don't -- we don't dispute that it is

2  relevant.  But we also would urge that there are other devices

3  that you can use with the power bank.  It is not like we allege

4  he only bought this phone to use this with this power bank and

5  those two devices are coupled.  He could charge other things

6  like a flashlight with this battery pack or he could --

7    THE COURT:  I appreciate that.

8    MR. CASH:  -- you know.

9    THE COURT:  But I don't think I'm going to go back

10  on --

11    MR. CASH:  That's --

12    THE COURT:  -- that order.

13    Then the only question becomes what's the right

14  protocol.  And it looks like there could be more discussion on

15  that is all I'm saying.  Because if your client knows he's

16  going to have to do it, then perhaps he can opt for a protocol

17  that he's somehow happy with or at least understands better.

18  Because it sounds like maybe you could have more discussion

19  and -- you have even complained today, oh, gosh, we don't

20  really learn very much when we have these discussions.

21    MR. CASH:  Well --

22    THE COURT:  Well, that can change because we know the

23  Court is unhappy when that happens.

24    So I want to leave it to the two of you to confer

25  further on that.  And any -- any motion, let's have it on file

1     a week from today.

2            MS. KELLY:  Thank you, your Honor.

3            THE COURT:  That way we keep things moving.

4            MR. CASH:  Could you -- we appreciate that.  And we

5     understand the ruling of the Court.

6            But I would ask for a little more guardrails on it.

7            THE COURT:  A little more what?

8            MR. CASH:  A little more guardrails in terms of the

9     conferral process.

10            The email she read, we did receive it at 7:00 P.M.

11     last night.

12            THE COURT:  I see.

13            MR. CASH:  There was a response at 10:00 P.M. last

14     night.

15            THE COURT:  It has to be reasonable.  So let's see.

16     In order to get that on file by Friday, you probably need to

17     confer by close of business on Tuesday.

18            MS. KELLY:  Okay.

19            THE COURT:  Right?  You probably need to do that.

20            And you need to make yourselves available.  And it

21     needs to not be by email, right?  It needs to be either in

22     person, video, or phone.

23            And that ought to give you enough guardrail, Mr. Cash.

24     She's willing to talk to you before Tuesday about this.  She

25     knows already a lot about the protocol she wants.  It is just a

1    question of having that explained to you and then you're

2    deciding whether you know enough, whether you need to know

3    more, what your objections are.

4          MR. CASH:  Okay.

5          THE COURT:  And you share them.  And then you may need

6    to talk some more next week.  But I think we got to work this

7    through.

8          Got to keep this moving, right?  I mean, the scope of

9    discovery did get expanded and it did take more time to get all

10   that stuff produced, the issues we were talking about before,

11   and I'm just not real eager to see this phone testing issue

12   delay it even more.  So that's where I'm coming from.

13         MR. CASH:  We appreciate it.

14         MS. KELLY:  Thank you, your Honor.

15         THE COURT:  Okay.  So there is no ruling on that

16   today.  But the order is going to say, confer by the end of

17   Tuesday, file a motion, agreed or contested, by the end of the

18   day on Friday, the 29th.

19         MS. KELLY:  Thank you.

20         MR. CASH:  And whose burden is it to file the motion?

21         THE COURT:  It can be whoever feels like they need the

22   relief.  It is probably going to be the defendant because they

23   are the ones who want this examination and testing to go

24   forward.  They are the ones who are unhappy with the current

25   state of the Feb order.

1        MR. CASH:  Okay.

2        THE COURT:  So I think it is going to have to be your

3   motion, Ms. Kelly.

4        MS. KELLY:  And are you envisioning, your Honor, as

5   drafted as kind of a motion to compel or is it some other

6   motion that you're envisioning?

7        THE COURT:  It is probably an -- it is probably an

8   agreed motion --

9        MS. KELLY:  Ideally it is agreed motion --

10       THE COURT:  -- that this will be the protocol.

11       MS. KELLY:  Yeah.

12       THE COURT:  But if there is a disagreement, yeah, it

13  is probably a motion to compel --

14       MS. KELLY:  Okay.  Thank you, your Honor.

15       THE COURT:  -- you know.

16       MS. KELLY:  I'm hoping --

17       THE COURT:  Best I can do for you.

18       MS. KELLY:  -- it's an agreed motion, so --

19       THE COURT:  Okay.  Well, me too.  But not everything

20  can be agreed.

21       MS. KELLY:  Yeah.

22       THE COURT:  That's why we're here.  I am glad to give

23  you the time.  But I just don't want to waste time, and I feel

24  like sometimes we do that.

25       MS. KELLY:  Understood.

1    THE COURT:  Not just you, but between me and you.

2    Okay.  I think that's all I had on my list today.

3    Anything else, plaintiff, today?

4    MR. CASH:  Your Honor, we did want to talk about the

5    scope of the February 28th order as it comes to the number of

6    models at issue.  And the Court has excluded from the scope of

7    discovery wireless power banks.  And I don't know how fully

8    that issue was (unintelligible) in the briefing.  And I would

9    appreciate the chance to put a little argument into the record

10   as to why wireless power banks should also be included in the

11   scope of discovery because they are in the scope of our class

12   too.

13   THE COURT:  It strikes me as raising an issue we have

14   already decided.  But you can always file a motion to

15   reconsider, even though no such motion procedures are really

16   found in the federal rules.  Take a look at the decision I made

17   in a case called Ellenby versus FireKing, you'll get a sense of

18   my attitude --

19   MR. CASH:  Say that again.

20   THE COURT:  Ellenby, E-L-L-E-N-B-Y.  You will get a

21   sense of my attitude about motions to reconsider.  It is kind

22   of adopting Judge Shadur's view as to those things.  You can

23   imagine how Judge Shadur felt about those.  He made a comment

24   about initial orders not being first drafts.

25   But if you need to do that, you can do that.  I think

1    that's a better posture than my trying to resolve that here

2    where, you know, defense doesn't really have advance notice

3    that you're going to raise that, maybe not really prepared to

4    respond to it today.

5           So if you need to file a motion, go ahead on the

6    February order.

7           I get concerned about suggesting that you all file

8    more motions because under Rule 1, I'm supposed to promote the

9    just, speedy, and inexpensive determination of the action.

10          And this case, for whatever reason, has generated a

11   very large and expensive volume of discovery motions.  It has.

12   So, you know, be judicious and be mindful of that.

13          If you have disputes, yeah, we'll try to resolve them.

14   This motion to reconsider doesn't sound like -- it sounds a

15   little bit like a frolic and detour to me.  But if you need to

16   file it, you can file it.  But I'm not going to decide that

17   today.

18          MR. CASH:  Yes, sir.

19          THE COURT:  Or have it argued today.

20          MR. CASH:  Understood.

21          THE COURT:  All right.  Anything else, plaintiff?

22          MR. CASH:  I guess the only other thing --

23          THE COURT:  I take my risk at asking that.

24          MR. CASH:  Exactly.

25          Well, obviously, we do need a new case management

1  schedule, which is going to include these depositions and so

2  on.  And we assume discovery will stay open until we get the

3  depositions, so --

4          THE COURT:  Yeah, that's going to be the subject of

5  what you get me a week from now on the first issues we talked

6  about.

7          MR. CASH:  Then we are set on our side.  And I

8  appreciate it.

9          THE COURT:  Okay.  Ms. Kelly, how about you for

10  Belkin?

11          MS. KELLY:  Nothing further.  Thank you, your Honor.

12          THE COURT:  Okay.  Listen, have a nice weekend.  I

13  won't be here next week, but that's in part why I don't want

14  anything from you till Friday.  We'll get it figured out, okay?

15          MS. KELLY:  Thank you, your Honor.

16          MR. CASH:  Thank you.

17          THE COURT:  Okay.  Thank you.  We're adjourned.

18            (Which concluded the proceedings.)

19                        CERTIFICATE

20          I certify that the foregoing is a correct transcript
    from the digital recording of proceedings in the above-entitled
21  matter to the best of my ability, given the limitation of using
    a digital-recording system.
22  /s/Pamela S. Warren                    April 2, 2024

23  Official Court Reporter - Retired              Date
    United States District Court
24  Northern District of Illinois
    Eastern Division

25