# EXHIBIT 5

| | |
|---|---|
| **From:** | Boardman, Michael |
| **Sent:** | Monday, April 1, 2024 10:50 AM |
| **To:** | Bill Cash; Kelly, Laura |
| **Cc:** | Sims, Nancy; Totino, Edward; Bradley Silverman (BSilverman@fbfglaw.com); Jason Ibey; Gil Melili |
| **Subject:** | RE: Gromov v. Belkin International, Inc., Case No. 1:22-cv-06918 |

Bill,

In advance of our meet and confer discussion we have done our best to provide answers to your questions below, although many of the questions appear more appropriate for expert discovery, not the development of a protocol (i.e., the steps of a testing process). We look forward to discussing the protocol with you further and hope that the parties can reach agreement on a joint submission to the Court.

1. What is the identity of the person doing the test? If you won't disclose this, why?

The identity of Belkin's expert is not relevant to a discussion about how the test will be conducted. As we explained in prior filings and at the March 22 hearing, Plaintiff's repeated demand for this information prior to expert discovery deadlines is premature. Belkin will comply with the scheduling order and Federal Rules regarding the scope and timing of expert discovery.

2. What are his or her credentials? Please explain how he or she is qualified to do this work.

This request is similar to No. 1 and is similarly a premature request for expert discovery that is not directed to resolving any dispute about the mechanics of a test. Belkin has selected someone whose credentials are appropriate to do the test and does not intend to waste time by engaging an unqualified person. If Plaintiff has concerns about the qualifications of Plaintiff's expert, those can be addressed at an appropriate time during expert discovery, but litigating the qualifications of Belkin's expert at this stage is premature and inappropriate.

3. Is this test defined by any industry body? Is this a standard test?

Could you please explain what you mean by "defined by an industry body"? We understand from our expert that the test would be considered a best practice test.

4. Will you permit an observer to be present to confirm that sensitive data is not gathered? If not, why not? And if not, what assurance do you provide other than just trusting your expert?

We do not believe that this is necessary or appropriate. Please let us know what data you are concerned about protecting and why the protective order would not be sufficient to the extent that it is inadvertently disclosed in some way. The request for an observer affiliated with Plaintiff also appears to be a backdoor way to kick off expert discovery and intrudes on Belkin's ability to work with undesignated experts or consultants.

You have given us two "options" for the test.

*If the phone is "wiped," then . . .*

5. My expert points out that it is still possible to restore information after a phone is wiped. How can we be sure that your expert will not retrieve such information? Can you provide an assurance other than "trust us, we will not do that?"

We do not understand what you are getting at with this question. Could you explain what you mean to "restore information" and how that might occur during the test? The test does not involve restoring any information.

6. A "wiped" phone would revert to the default settings, which are not necessarily the settings Gromov used. If the intent of the test is to test Gromov's actual experience, how would these results be relevant or useful?

We do not understand how this question is relevant to developing a test protocol. Plaintiff can make arguments about the effect of the test at an appropriate time, but such questions and arguments are not a basis to oppose the test in the first instance. Belkin also notes that Plaintiff has opposed providing his phone in its current condition, which is a reason that we proposed a factory reset.

7. A "wiped" phone would not have the current updates to Android, including battery improvements made by Google. If the intent of the test is to test Gromov's actual experience, how would these results be relevant or useful?

Please identify any battery improvements that you believe would be necessary so that we can discuss with more specificity.

8. The only way to get security updates on an Android phone is to register a Google ID into the phone, that's how you log onto the Google Play Store. This will involve synching data back to the phone post-wipe. How can we be assured Mr. Gromov's privacy would be protected?

The test does not involve syncing any data and we presume Mr. Gromov would perform any restoration independently. Could you please explain the nature of this concern?

9. After wiping, there is no guarantee that Gromov can restore the phone to its current status—the configuration of the system, including settings and Android updates, as it exists now. In our view, that's a destructive test. If we conduct our own rebuttal test later, we will not be able to say that the test was apples to apples. Why is your test not a destructive one that involves spoliation of the evidence?

Could you further explain this concern? A later test, if done on a device that is restored to factory settings, would by definition be "apples to apples."

10. Will you compensate Mr. Gromov for the expense and time of restoring his phone to its original condition?

We do not understand how any costs could be incurred to do this and do not believe any compensation would be appropriate. Plaintiff brought this lawsuit based upon the operation of his device and has a duty to turn over relevant and discoverable information as part of the ordinary scope of litigation.

*If the phone is not "wiped," then you proposed we would have to unlock the phone to ensure the absence of background apps. Questions . . .*

11. What apps specifically?

We cannot answer this because we do not know what apps are installed and running on the device.

12. My expert points out that a phone can have numerous apps and processes and there is no way to disable them all. For example, e-mail is a background app that periodically checks with a server for new mail. The operating system itself sometimes performs processes such as garbage collection. If your expert had access to an unlocked phone, how could your expert know which apps are running, other than going into the settings and looking at the identity of every single app?

The expert would look to see which apps were running and close them to the extent permitted by the operating system of the device.

13. How would you protect Mr. Gromov's private information during that inspection?

The test does not involve looking at any private information stored on the device. But, given your concern, we recommend performing the test on a restored device so that the device need not be unlocked.

14. And how could your expert be sure that the operating system did not run background processes during the test?

Again, we recommend that the test be conducted on a factory restored phone to eliminate questions about what is and is not running on the device.

15. Could Mr. Gromov or my expert disable the "background apps" instead? That way, your expert would not have to have access to an unlocked phone. That just might solve our privacy concern, our spoliation concern, and your concern for not having background apps present. What's your response?

We believe that a factory reset would be the best way forward and minimize any questions about whether background apps are in use. If Mr. Gromov is able to certify under oath that all background apps have been disabled, we are willing to discuss that with you, so long as the device will be provided such that we can read the battery capacity gauge as reported by Samsung. We would also need to agree on a protocol that involves videotaping what steps were taken to disable the background apps and to show that the device was placed into a sealed shipping box immediately after the apps have been disabled and demonstrate that nothing else had been modified.

Other questions:

16. How would you discharge the phone fully?

We will leave it turned on until it shuts off.

3

17. How we can be sure this does not degrade the phone's battery? (My expert says that a full discharge puts extra stress on the battery cell, which I think is common knowledge. Belkin itself says that the charge/discharge cycle affects battery life. https://www.belkin.com/support-article/?articleNum=318270) If we tested the phone in rebuttal, isn't its condition different? Why is your test not spoliation of evidence or at least degradation of evidence?

We do not believe that this is a valid concern for purposes of developing a protocol. Please let us know if you have any specific evidence of how a single or limited number of charge cycles would "degrade" the device.

18. All batteries degrade. If your test is designed to test Mr. Gromov's actual experience with the phone and with the Pocket Power 10K, how could it do that, knowing that the phone's battery has had years to deteriorate compared with when he first got the power bank? How is your test actually probative of anything?

See our response to number 17 above. And, again, this question appears to be aimed at developing challenges by Plaintiff to the test results, not to develop a test protocol. The Court has already ruled that Plaintiff must produce the phone for testing and that order was affirmed at the recent status conference. Plaintiff's constant attempts to relitigate this issue are not well-taken.

19. What is a data logger? What specifically would be logged?

A data logger is a device that reads and records measured voltage and current data.

20. When you said in court that only a charging cable would be used, please define that. My expert says a cable with conductors only on the +5 and GND pins, but without conductors on the DATA- and DATA+ pins, would not be capable of accessing data on the phone. Would you agree to use that kind of cable?

The test will use a standard phone charging cable which has power pins as well as data pins. We will not change these conductors.

21. If so, how can we be sure—other than just trusting you and your expert—that another cable couldn't also be plugged into the device?

We do not understand this concern.

22. Is your expert a Belkin employee?

No.

23. Overall, please explain how this test is probative of issues in the case.

The Court has already ordered an inspection because the ability of the device to charge and discharge is relevant to Gromov's claims. Plaintiff's efforts to relitigate this issue are improper.

**From:** Bill Cash <bcash@levinlaw.com>
**Sent:** Tuesday, March 26, 2024 8:00 AM
**To:** Kelly, Laura <Laura.Kelly@bakermckenzie.com>
**Cc:** Sims, Nancy <Nancy.Sims@bakermckenzie.com>; Totino, Edward <Edward.Totino@bakermckenzie.com>; Boardman, Michael <Michael.Boardman@bakermckenzie.com>; Bradley Silverman (BSilverman@fbfglaw.com) <BSilverman@fbfglaw.com>; Jason Ibey <jason@kazlg.com>; Gil Melili <gil@kazlg.com>
**Subject:** [EXTERNAL] RE: Gromov v. Belkin International, Inc., Case No. 1:22-cv-06918

Laura,

I'm glad you wrote. I do have a set of questions for you.

Before we get on the phone, I would like to request numbered answers to each question in writing. That would give both sides some time to think and some reasonable assurance to us that there is not miscommunication during the call. Also, if the answers work out, maybe we don't need a call.

I have to appear in court in Alabama tomorrow at 1:30 and I have to fly this afternoon to get there. I would suggest that you take the day with our questions, and then we talk on Wednesday instead. I don't know how long the court will keep us, but I think I should be available from maybe 3:30pm to about 6pm CDT. (Then at 6pm or so, I have a flight home to catch.)

1. What is the identity of the person doing the test? If you won't disclose this, why?

2. What are his or her credentials? Please explain how he or she is qualified to do this work.

3. Is this test defined by any industry body? Is this a standard test?

4. Will you permit an observer to be present to confirm that sensitive data is not gathered? If not, why not? And if not, what assurance do you provide other than just trusting your expert?

You have given us two "options" for the test.

*If the phone is "wiped," then . . .*

5. My expert points out that it is still possible to restore information after a phone is wiped. How can we be sure that your expert will not retrieve such information? Can you provide an assurance other than "trust us, we will not do that?"

6. A "wiped" phone would revert to the default settings, which are not necessarily the settings Gromov used. If the intent of the test is to test Gromov's actual experience, how would these results be relevant or useful?

7. A "wiped" phone would not have the current updates to Android, including battery improvements made by Google. If the intent of the test is to test Gromov's actual experience, how would these results be relevant or useful?

8. The only way to get security updates on an Android phone is to register a Google ID into the phone, that's how you log onto the Google Play Store. This will involve synching data back to the phone post-wipe. How can we be assured Mr. Gromov's privacy would be protected?

9. After wiping, there is no guarantee that Gromov can restore the phone to its current status—the configuration of the system, including settings and Android updates, as it exists now. In our view, that's a destructive test. If we conduct our own rebuttal test later, we will not be able to say that the test was apples to apples. Why is your test not a destructive one that involves spoliation of the evidence?

10. Will you compensate Mr. Gromov for the expense and time of restoring his phone to its original condition?

*If the phone is not "wiped," then you proposed we would have to unlock the phone to ensure the absence of background apps. Questions . . .*

11. What apps specifically?

12. My expert points out that a phone can have numerous apps and processes and there is no way to disable them all. For example, e-mail is a background app that periodically checks with a server for new mail. The operating system itself sometimes performs processes such as garbage collection. If your expert had access to an unlocked phone, how could your expert know which apps are running, other than going into the settings and looking at the identity of every single app?

13. How would you protect Mr. Gromov's private information during that inspection?

14. And how could your expert be sure that the operating system did not run background processes during the test?

15. Could Mr. Gromov or my expert disable the "background apps" instead? That way, your expert would not have to have access to an unlocked phone. That just might solve our privacy concern, our spoliation concern, and your concern for not having background apps present. What's your response?

Other questions:

16. How would you discharge the phone fully?

17. How we can be sure this does not degrade the phone's battery? (My expert says that a full discharge puts extra stress on the battery cell, which I think is common knowledge. Belkin itself says that the charge/discharge cycle affects battery life. https://www.belkin.com/support-article/?articleNum=318270) If we tested the phone in rebuttal, isn't its condition different? Why is your test not spoliation of evidence or at least degradation of evidence?

18. All batteries degrade. If your test is designed to test Mr. Gromov's actual experience with the phone and with the Pocket Power 10K, how could it do that, knowing that the phone's battery has had years to deteriorate compared with when he first got the power bank? How is your test actually probative of anything?

19. What is a data logger? What specifically would be logged?

20. When you said in court that only a charging cable would be used, please define that. My expert says a cable with conductors only on the +5 and GND pins, but without conductors on the DATA- and DATA+ pins, would not be capable of accessing data on the phone. Would you agree to use that kind of cable?

21. If so, how can we be sure—other than just trusting you and your expert—that another cable couldn't also be plugged into the device?

22. Is your expert a Belkin employee?

23. Overall, please explain how this test is probative of issues in the case.

**Bill Cash III**
*Of Counsel*

Levin, Papantonio, Rafferty, Proctor, Buchanan, O'Brien, Barr, & Mougey, P.A.
316 South Baylen Street, Suite 600, Pensacola, Florida 32502
Phone: 850-435-7059
www.levinlaw.com

**From:** Kelly, Laura <Laura.Kelly@bakermckenzie.com>
**Sent:** Monday, March 25, 2024 1:28 PM
**To:** Bill Cash <bcash@levinlaw.com>
**Cc:** Sims, Nancy <Nancy.Sims@bakermckenzie.com>; Totino, Edward <Edward.Totino@bakermckenzie.com>; Boardman, Michael <Michael.Boardman@bakermckenzie.com>
**Subject:** Gromov v. Belkin International, Inc., Case No. 1:22-cv-06918

**CAUTION:** This email message is **EXTERNAL.**

Bill,

Just following up on our discussion from Friday regarding the inspection protocol for your client's phone. Consistent with our discussions, could you please provide the list of questions you have concerning the attached protocol sent Thursday evening?

Please also let us know if you have availability to discuss sometime tomorrow afternoon so that the parties may resolve any lingering issues and submit an agreed protocol to the court by the end of this week.

Thank you,
Laura

**Laura Kelly**
Associate
Baker & McKenzie LLP
300 East Randolph Street, Suite 5000
Chicago, IL 60601 United States
Tel: +1 312 861 2510
Cell: +1 312 889 3571
Fax: +1 312 698 2408
laura.kelly@bakermckenzie.com



bakermckenzie.com | Facebook | LinkedIn | Twitter

This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message. Please visit www.bakermckenzie.com/disclaimers for other important information concerning this message.